FILED & JUDGMENT ENTERED
Christine F. Ramsey

September 17 2026

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

Ashley Austin Edwards
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>DBMP LLC,<br><br>Debtor. | Case No. 20-30080<br>Chapter 11 |
| Official Committee of Asbestos Personal Injury Claimants, and Sander L. Esserman, in his capacity as Legal Representative for Future Asbestos Claimants, each on behalf of the estate of DBMP LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CertainTeed LLC, CertainTeed Holding Corporation, and Saint-Gobain Corporation,<br><br>Defendants. | Adv. Proc. No. 22-03000 |

## ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**THIS MATTER** is before the Court upon the Plaintiffs' *Motion for Partial Summary Judgment*, filed on May 14, 2026 (the "Motion"),[1] seeking partial adjudication of the Plaintiffs' *Amended Complaint*, filed on February 10, 2022 (the "Complaint").[2] The Defendants filed their *Memorandum of Law in Opposition* (the "Objection") on June 15, 2026.[3] The Plaintiffs filed their *Reply Memorandum in Support* (the "Reply") on July 20, 2026.[4] On August 6, 2026, the Court held a hearing on the Motion (the "Hearing").[5] Kevin Maclay, Jeffrey Liesemer, and Nate Miller appeared on behalf of the ACC, and Felton Parrish appeared on behalf of FRC. Michael Goldstein, Gabrielle Gould, and Howard Steele appeared on behalf of the Defendants; Gregory Gordon appeared on behalf of the Debtor.

The Plaintiffs[6] in this case hold asbestos claims against the Debtor. DBMP and Defendant CertainTeed LLC ("New CertainTeed")[7] are the two successors of Old CertainTeed created through a Texas divisional merger (the "Restructuring"), which transferred nearly all CertainTeed Corporation's ("Old CertainTeed") assets to New CertainTeed and its asbestos liabilities, certain assets, and a Funding Agreement (as defined below) to DBMP. The Plaintiffs allege that the

---

[1] [3:22-ap-03000, Doc. No. 376].

[2] [3:22-ap-03000, Doc. No. 14]. The Plaintiffs filed their original *Complaint* [3:20-bk-30080, Doc. No. 1296; 3:22-ap-03000, Doc. No. 1] on January 21, 2022. On August 5, 2022, the Defendants answered the Complaint, *see Answer* [3:22-ap-03000, Doc. No. 93] (the "Answer"), by denying the Plaintiffs' allegations underpinning all counts, as well as asserting fourteen affirmative defenses, three of which claimed that the Restructuring provided DBMP with value. *See* Answer at 35–36.

[3] [3:22-ap-03000, Doc. No. 411].

[4] [3:22-ap-03000, Doc. No. 459].

[5] *See* Hr'g Transcript, Aug. 6, 2026 [3:22-ap-03000, Doc. No. 486] (the "Transcript").

[6] Particularly, the Plaintiffs constitute the Official Committee of Asbestos Personal Injury Claimants (the "ACC") and the legal representative for future asbestos claimants, Sander L. Esserman (the "FCR").

[7] The other Defendants are DBMP's and New CertainTeed's immediate successive parent entities, CertainTeed Holding Corporation and Saint Gobain Corporation.

Restructuring was a fraudulent transfer under federal, Delaware, North Carolina, Pennsylvania, and Texas law. Counts III and IV of the Complaint in particular allege that the Restructuring constituted a constructive fraudulent transfer. The Motion seeks summary judgment as to whether the Funding Agreement legally constitutes "value" for purposes of the Complaint. Plaintiffs argue that the Funding Agreement constitutes an "unperformed promise to furnish support to the debtor," which applicable law *per se* excludes from comprising value in a fraudulent transfer action.[8] For the reasons below, the Court denies the Motion.

## I. BACKGROUND

1. On January 23, 2020 (the "Petition Date"), DBMP filed under Chapter 11, with the stated goal of establishing a trust under section 524(g) of the Bankruptcy Code. DBMP is one of two successor entities of Old CertainTeed, the other being New CertainTeed, that were formed ninety-two days prior to the Petition Date as a result of a corporate restructuring executed by the Defendants. The Restructuring dissolved Old CertainTeed's existence and allocated approximately 97% of Old CertainTeed's assets to New CertainTeed, while allocating all of Old CertainTeed's asbestos liabilities to DBMP. The Restructuring and DBMP's ensuing bankruptcy filing represent a novel two-part legal maneuver known as the "Texas Two Step," whereby an entity seeks bankruptcy relief while limiting the burdens of bankruptcy to only the entity holding the liabilities. DBMP's case is one of five Texas Two Step bankruptcy cases that have been filed to date, four of which were originally brought in this Court and three of which, including DBMP, remain.[9]

---

[8] *See* Motion ¶ 1. From this determination, the Motion also seeks the further determination that the Debtor therefore did not receive reasonably equivalent value through the Restructuring. *See id.* ¶ 6. Consequently, the Motion seeks striking the Defendants fourth and fifth defenses in the Answer in part, based on the first determination, as well as the sixth in whole based on the second determination. *See id.* ¶ 7.

[9] The other three cases originally brought in this Court are: (1) *In re Bestwall LLC*, Case No. 17-31795; (2) *In re Aldrich Pump LLC,* Case No. 20-30608, and *In re Murray Boiler*, Case No. 20-30609; and (3) *In re LTL Management LLC*, Case No. 21-30589. The fourth Texas Two Step bankruptcy case, brought in the Southern

**A. <u>Pre-Petition Factual History</u>**

2. Old CertainTeed comprised part of a multinational building-products group—now instead comprising New CertainTeed and DBMP—the U.S. and ultimate parents of which are the Saint Gobain Corporation ("SGC") and French-headquartered Compagnie de Saint-Gobain S.A ("CSG"), respectively.[10] From the 1930s until 1993, CertainTeed manufactured and sold asbestos-containing cement pipe and other products containing asbestos.[11] Because of that business, CertainTeed has faced hundreds of thousands of asbestos-induced personal injury and wrongful death claims since the 1970s,[12] with over 60,000 asbestos lawsuits pending against CertainTeed or DBMP as of the Petition Date.[13]

3. CertainTeed resolved these asbestos lawsuits until the Petition Date by defending itself in various courts or by settling many such claims.[14] From 2002 to 2019, Old CertainTeed incurred approximately $2 billion in costs defending and resolving asbestos claims (of which approximately $1.5 billion was not covered by insurance), which ranged annually from $80 million to over $160 million, and faced more than 300,000 total asbestos claims, which approximate to 1,400 a year.[15]

---

District of Texas Bankruptcy Court, was *In re Tehum Care Services, Inc.*, Case No. 23-90086. *Tehum* is the only Texas Two Step that has been confirmed, although the operating entity that was obliged to pay the liabilities under the confirmed plan has already defaulted.

[10] *See Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions* ¶ 28 [Case No. 20-30080, Doc. No. 972; Adv. Proc. No. 20-03004, Doc. No. 343] ("Injunction Order"); Objection ¶ 13, n.4 (citation omitted).

[11] *See Declaration of Robert J. Panaro in Support of First Day Pleadings* ¶ 25 [3:20-bk-30080, Doc. No. 24] (The "Panaro Decl.").

[12] *See* Panaro Decl. ¶ 27.

[13] *See id.* ¶ 28.

[14] *See Declaration of Michael T. Starczewski* ¶¶ 15–16, [3:20-ap-03004, Doc. No. 238] (The "Starczewski Decl.").

[15] *See* Objection ¶ 15, nn.9–12 (citing Panaro Decl. ¶¶ 27, 29, 30, 32).

4. Approximately two years prior to Petition Date, certain CertainTeed executives began planning, under the codename "Project Horizon," for evaluating mechanisms of dealing with the asbestos liabilities.[16] By later in 2019, the Project Horizon team had settled on CertainTeed implementing the Restructuring and the Defendants' Texas Two Step.[17] During this period, Old CertainTeed drafted an agreement that provided for payments for their asbestos liabilities to a then undetermined entity carrying the asbestos liabilities (the "Funding Agreement"). *In re DBMP LLC*, 2026 Bankr. LEXIS 883, at *32–35. "These were not arm's-length agreements, as they were 'negotiated' by Old CT and CT Holdings for entities that did not yet exist and were later revised and ratified by New CT through signatories serving both entities or their parent." *Id.* at 32.

5. On October 22 and 23, 2019, Old CertainTeed executed a series of transactions that culminated in the Restructuring.[18] On the first day, October 22, 2019, four events occurred:

(1) Old CertainTeed's then-direct parent, Saint-Gobain Delaware Corporation, formed CT Holding and contributed to it all the issued and outstanding stock of Old CT in exchange for a full ownership interest in CT Holding;
(2) Old CertainTeed converted from a Delaware corporation to a Delaware limited liability company ("LLC");
(3) DBMP formed Millwork & Panel ("M&P"), to which it allocated certain assets including property and a bank account containing approximately $30 million in cash; and
(4) Old CertainTeed entered into the Funding Agreement with CertainTeed Holding Corporation ("CT Holding"), with Old CertainTeed as payee and CT Holding as payor.

---

[16] *In re DBMP LLC*, No. 20-30080, 2026 Bankr. LEXIS 883, at *16–17 (Bankr. W.D.N.C. Mar. 16, 2026).

[17] *Id.* at *17.

[18] *See* Objection ¶ 17.

The next day, on October 23, 2019, various events occurred:

(1) Old CertainTeed converted from a Delaware LLC to a Texas LLC;
(2) Old CertainTeed implemented the Plan of Divisional Merger under Texas Law, which
  (a) dissolved Old CertainTeed and created as its successors, DBMP and New CertainTeed, both Texas LLCs, and
  (b) transferred from Old CertainTeed
    (i) to New CertainTeed, all non-asbestos liabilities of Old CertainTeed,
    (ii) to New CertainTeed, the remainder of Old CertainTeed's assets, free and clear of asbestos liabilities,
    (iii) to DBMP, all Old CertainTeed's asbestos liabilities (except certain limited workers compensation claims),
    (iv) to DBMP, tangible assets consisting of
      (A) bank accounts containing approximately $25 million in cash, and
      (B) M&P, which Defendants estimated to be worth approximately $150 million,
    (v) to DBMP, Old CertainTeed's rights and interests as payee under the Funding Agreement;
(3) New CertainTeed converted from a Texas LLC to a Delaware LLC, whereas DBMP converted from a Texas LLC to a North Carolina LLC;
(4) New CertainTeed assumed the obligations of payor under the Funding Agreement from CT Holding, who was thereafter released pursuant to the Funding Agreement;
(5) DBMP entered into various other agreements with various entities related to CertainTeed or SGC, including with New CertainTeed; and
(6) The Funding Agreement (as well as the other agreements related to the Restructuring) was amended to reflect the new names of parties now obliged pursuant to the above.[19]

Old CertainTeed's assets were worth an estimated $3 billion before Restructuring.[20] Based on that valuation, 97% of Old CertainTeed's assets, worth around $2.8 billion, were transferred free and

[19] *See* Panaro Decl. ¶¶ 17–19; *see also* Objection ¶¶ 16–18 (citing *id.* ¶¶ 16–20).

[20] Injunction Order ¶ 57. Apart from its ownership of M&P, DBMP did not receive an interest in any other operating business. *See* Motion ¶ 14. The parties use different measures to value DBMP's interest in M&P. DBMP's balance sheet from October 23, 2019, reported a book value of approximately $62 million. *See* DBMP LLC Balance Sheet (MSJ Ex. H). As of the Petition Date, DBMP estimated the interest's fair market value at approximately $150 million and projected that M&P would generate $16 million in EBITDA in 2020 and approximately $15 million annually over the following five years. *See* Panaro Decl. ¶ 20. M&P reported EBITDA totaling $47.585 million for calendar year 2025. *See Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Estate of DBMP LCC Holds a Substantial or Controlling Interest* [Doc. No. 3253]; *Periodic Report Regarding*

clear of the Plaintiffs' asbestos claims to New CertainTeed, whereas 3% of assets were transferred to DBMP. DBMP's balance sheet from October 23, 2019, reported almost $584 million in liabilities, including approximately $576 million in estimated uninsured asbestos liabilities.[21] The amount of DBMP's current and future asbestos liabilities has not yet been estimated by the Court.[22]

### B. <u>The Funding Agreement, Its Related Accounting, and Subsequent Financial Information</u>

6. As part of the Restructuring, DBMP and New CertainTeed entered into an amended and restated Funding Agreement.[23] The Funding Agreement requires New CertainTeed to fund DBMP's asbestos-related liabilities to the extent distributions from M&P were insufficient.[24] In a Chapter 11 case, the agreement provided funding for a § 524(g) trust to the extent DBMP's assets were insufficient to fund such a trust.[25] The Funding Agreement did not provide for fixed installment payments to DBMP but provided funding based on DBMP's requests.[26] Accordingly, the Funding Agreement did not require a payment—and no payment was actually made—to DBMP when the Restructuring closed on October 23, 2019. DBMP made its first funding request to New CertainTeed on or after November 27, 2019.[27] New CertainTeed's obligations under the Funding Agreement were not secured by its assets.[28] The Funding Agreement charged no interest

*Value, Operations, and Profitability of Entities in Which the Estate of DBMP LCC Holds a Substantial or Controlling Interest* [Doc. No. 3385] (together "Periodic Reports").

[21] *See* DBMP LLC Balance Sheet; CertainTeed LLC Consolidated Balance Sheets; Hr'g Tr. 155:16-156:5, Mar. 1, 2021 (Diaz Direct).

[22] *See* Objection ¶ 23.

[23] Injunction Order ¶¶ 64–65; ACC-FCR Ex. 2 (MSJ Ex. K).

[24] Funding Agr. § 2 (MSJ Ex. K).

[25] Injunction Order ¶ 66; Funding Agr. at 5–6. The Court notes that a § 524(g) trust could only be confirmed by the Court with support from the Plaintiffs.

[26] Reply ¶ 16.

[27] ACC-FCR Ex. 18; DiNenna Dep. 117:14-118:9, 118:21-25, Sept. 24, 2020.

[28] Injunction Order ¶ 75.

and was not a loan in the sense that it did not require repayment of amounts funded. Additionally, New CertainTeed's funding obligations were uncapped.[29] The Funding Agreement bars assignment by DBMP to another entity without New CertainTeed's consent.[30]

7. On October 23, 2019, New CertainTeed's balance sheet reported an approximately $496 million "long-term funding obligation due to related party," and DBMP's balance sheet reported an approximately $494 million "Funding Agreement Receivable."[31] This accounting entry was calculated generally as the estimated asbestos liability less the value of DBMP's cash and M&P's book value.[32] DBMP's first day declarations identified as an acquired asset Old CertainTeed's rights and interests as payee under the Funding Agreement and estimated the value of DBMP's other assets at approximately $175 million.[33]

8. Following the Petition Date, New CertainTeed has consistently funded requests made by DBMP under the Funding Agreement after the Restructuring. As of February 18, 2021, DBMP had requested an aggregate of $64.5 million, principally for administrative costs of the bankruptcy case, and New CertainTeed had funded all such requests.[34] New CertainTeed's reported

---

[29] Panaro Dep. 94:4-17, Oct. 6, 2020. Witnesses described its intended function as giving DBMP access to the same paying capacity Old CertainTeed had before the restructuring. Starczewski Dep. 225:18-226:3, Oct. 1, 2020; Panaro Dep. 94:4-17; Rayfield Dep. 97:3-8, Oct. 7, 2020.

[30] *See DBMP LLC v. Those Parties Listed on Appendix A to Complaint* (*In re DBMP LLC*), Adv. Pro. No. 20-30080, 2021 Bankr. LEXIS 2194, at *33 (Bankr. W.D.N.C. Aug. 11, 2021) (hearing transcript citation omitted); *see also* Funding Agr. § 4(b).

[31] CertainTeed LLC Consolidated Balance Sheet, MSJ Ex. G; DBMP LLC Balance Sheet, MSJ Ex. H.

[32] Starczewski Dep. 170:19-171:3.

[33] Panaro Decl. ¶ 18. The parties disagree whether the approximately $494 million receivable should be treated as a distinct asset in addition to the Funding Agreement or as the accounting value associated with the Funding Agreement. Joseph Bondi testified that the receivable was part of the Funding Agreement's value and described the Funding Agreement as covering additional amounts that might be needed beyond DBMP's existing asset base. Bondi Dep. 300:25-301:11, Oct. 9, 2020. Sean Knapp testified that a long-term receivable due from New CertainTeed was contributed when DBMP was created. Knapp Dep. 265:20-23, Sept. 30, 2020.

[34] *In re DBMP LLC*, 2021 Bankr. LEXIS 2194, at *17.

long-term funding obligation declined from approximately $496.3 million on October 23, 2019, to approximately $402.3 million on December 31, 2025.[35]

9. CSG's 2025 consolidated financial statements reported a $402 million provision associated with the Funding Agreement, compared with $405 million at year-end 2024.[36]

10. On September 15, 2021, DBMP and New CertainTeed entered into an amended and restated Funding Agreement.[37] On January 5, 2022, they entered into a stipulation providing that the Funding Agreement is a valid contract enforceable according to its terms.[38] The stipulation also provides that funding for a § 524(g) plan is available regardless of whether New CertainTeed receives § 524(g) protection or supports the plan, and it covers DBMP's costs and expenses in enforcing New CertainTeed's performance.[39] Additionally, the stipulation purports to subject DBMP's indemnification obligations to the automatic stay during the Chapter 11 case,[40] and to restrict New CertainTeed from issuing dividends, forgiving intercompany debt, or entering agreements that prohibit payments under the agreement.[41]

### C. **Subsequent Financial Information, Fraudulent Transfer Proceeding, and Estimation Proceeding**

11. In relation to an injunction proceeding initiated on the Petition Date, this Court expressed various concerns as to the Funding Agreement and its conditionality on August 11, 2021. *See DBMP*, 2021 Bankr. LEXIS 2194, at *31–*34 (canvassing how the Funding Agreement was

---

[35] CertainTeed LLC Consolidated Balance Sheets, MSJ Exs. G, C.

[36] Objection ¶ 47.

[37] *Motion of the Debtor for an Order Authorizing It to Enter into Second Amended and Restated Funding Agreement* ¶ 11 [Doc. No. 1051].

[38] *Stipulation Between the Debtor and CertainTeed LLC Regarding Second Amended Funding Agreement* ¶ 2 [Doc. No. 1279] ("Funding Agr. Stipulation").

[39] *Second Amended and Restated Funding Agreement* § 1 at 6 (Funding Agr. Stipulation Ex. A).

[40] *Id.* § 5.

[41] *Id.* §§ 4(c)-(d).

(1) contingent on insufficiency of M&P's cash distributions' and DBMP's assets, (2) dependent on enforcement by and against entities, DBMP and New CertainTeed, that have essentially the same executives, (3) utilizing a vague standard for payments of costs that are "necessary or appropriate," with no specified categories and no dispute-resolution mechanism if New CertainTeed denies a request from DBMP, (4) nonassignable without New CertainTeed's consent, and (5) dependent on New CertainTeed's continued financial health, since the obligations are unsecured, not guaranteed by SGC or CSG, with New CertainTeed remaining free to incur senior debt, forgive material intercompany receivables (including from SGC and CSG), merge or consolidate, transfer substantially all assets, or pay dividends to its parent, CT Holding).

12. The Court also expressed concerns with the effect that the Restructuring had on the Plaintiffs' rights as creditors. *See id.* at *66–67 (finding based on the evidence from the Preliminary Injunction Proceeding that "it appears that the [Restructuring] had a material, negative effect on the [Plaintiffs'] ability to recover on their claims" given that pre-Restructuring, they had "the same ability and rights to access Old CertainTeed's considerable assets as did its other unsecured (non-asbestos) creditors," whereas post-Restructuring, they "were placed one step beyond those assets and made dependent on the DBMP's willingness to press its rights under the Funding Agreement," which the Court had found was "conditional, unsecured, and can be enforced only by DBMP acting through seconded SGC employees, not by the asbestos claimants").

13. Following the conclusion of the injunction proceeding, the Plaintiffs brought this fraudulent transfer adversary proceeding. On May 6, 2022, the Defendants moved to dismiss the proceeding,[42] to which the Plaintiffs objected on June 3, 2022,[43] and for which the Defendants

---

[42] *See Motion to Dismiss Adversary Proceeding* [Adv. Pro. No. 20-30080, Doc. No. 38].

[43] *See Response* [Doc. No. 58].

filed a reply on June 14, 2022.[44] On June 22, 2022, the Court denied the Defendants' motion to dismiss the Fraudulent Transfer Proceeding.[45] On August 5, 2022, the Defendants filed their Answer.[46]

14. Counts III and IV of the Amended Complaint seek avoidance of the Restructuring as a constructive fraudulent transfer.[47] Portions of Defendants' Fourth and Fifth affirmative defenses, and the entirety of their sixth affirmative defense, assert that value or reasonably equivalent value was exchanged in or in connection with the restructuring.[48]

15. DBMP has sought estimation of its current and future mesothelioma liabilities for purposes of developing a Chapter 11 plan.[49] Discovery remains ongoing, and the current case-management order provides for an evidentiary hearing to begin no earlier than September 18, 2028, and conclude no later than November 17, 2028.[50]

## II. DISCUSSION

16. The Motion requests the Court grant partial summary judgment declaring that the Funding Agreement does not satisfy the definition of "value" for a fraudulent transfer action in the Bankruptcy Code—namely, 11 U.S.C. § 548(d)(2)(A)—and the corresponding provisions of Delaware, North Carolina, Pennsylvania, and Texas law—namely, 6 DEL. CODE § 1303(a), N.C. GEN. STAT. § 39-23.3(a), 12 PA. CONS. STAT. § 5103(a), and TEX. BUS. & COM. CODE § 24.004(a)

---

[44] *See Defendants' Reply* [Doc. No. 67].

[45] *See Order Denying Motion to Dismiss Amended Complaint* [Doc. No. 89].

[46] *See Answer to Amended Complaint* [Doc. No. 93].

[47] *See* Amended Complaint ¶¶ 143–52.

[48] *See* Answer at 35–36.

[49] *See Motion for Estimation of Current and Future Mesothelioma Claims* [Doc. No. 948].

[50] *See Amended Agreed Case Management Order for Estimation* [Doc. No. 3417].

(collectively, including the federal version, the 'value statutes').[51] Specifically, the Plaintiffs move under the second part of the value statutes, which all exclude "an unperformed promise" "to furnish support to the debtor" from constituting "value" in a fraudulent transfer action (the 'excluded promise clause'), with the state excluded promise clauses adding the requirement that such promise must be "made otherwise in the ordinary course of the promisor's business." 11 U.S.C. § 548(d)(2)(A).

17. First, for the ease of the reader, the federal value statutes provide that:

> In this section—"value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor.

11 U.S.C. § 548(d)(2)(A). The state value statutes all provide:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

6 DEL. CODE § 1303(a); N.C. GEN. STAT. § 39-23.3(a); 12 PA. CONS. STAT. § 5103(a); TEX. BUS. & COM. CODE ANN. § 24.004(a)).

18. In particular, the Plaintiffs seek partial summary judgment on the question of whether the excluded promise clause encompass the Funding Agreement and therefore precludes it from constituting value for purposes of this fraudulent transfer adversary proceeding.[52] The Plaintiffs argue that summary judgment is both proper—if not mandatory—because the question represents a discrete matter of law as to which no material fact is genuinely disputed.[53]

---

[51] The state value statutes have identical text (with the exception of Pennsylvania, which added "[g]eneral rule" as a title). The text of the federal and the state value statutes is generally similar, save for various formalistic changes to the first part, the defining clauses (as defined below), as well as the state value statutes' substantive change to their excluded promise clause with the addition of the not-ordinary-course-of-business phrase.

[52] Motion ¶ 6–7.

[53] Reply ¶ 23.

Predominantly, the Defendants object on the basis that summary judgment is improper here because genuine disputes of material fact exist as to the value of the Funding Agreement. Additionally, Defendants vigorously contest the application of the excluding promise clauses to the Funding Agreement as a matter of law.

## A. Legal Background

### 1. Summary Judgment and Partial Summary Judgment

19. Under Federal Rule of Civil Procedure 56,[54] "court[s] *shall* grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (emphasis added). This applies to a "claim or defense—or the *part* of [a] claim or defense." *Id.* (emphasis added). Partial summary judgment, which the rule expressly permits without distinguishment, functions as a "pretrial adjudication that certain issues shall be deemed established for the trial" and "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Id.* Adv. cmt. 1946 note.[55]

---

[54] Incorporated into bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.

[55] The Defendants cite two extra-circuit federal district court cases for the proposition that partial summary judgment motions "are generally disfavored because they are resolved by orders that cannot be appealed until final adjudication" and "are permissible only when they benefit both parties and serve the interest of judicial economy." *See* Objection ¶ 45 (citing *Interstate 10 Partners, LLC v. Berkley Nat'l Ins. Co.*, No. 3:23-cv-01233, 2026 WL 800967, at *4 (M.D. Tenn. Mar. 21, 2026); *Arconic Inc. v. Novelis Inc.*, No. 17-1434, 2020 WL 7360152, at *1 (W.D. Pa. Dec. 15, 2020)). However, as the Plaintiffs note, first, that view is divorced from the text of Federal Rule of Civil Procedure 56, which "does not 'disfavor' or impose a more exacting standard on motions for partial summary judgment." *See* Reply ¶ 26. Second, the two cases cited are nonbinding and inapplicable here, given that their specific procedural histories counseled against allowing consideration of partial summary judgment given efficiencies. *See* Reply ¶¶ 27, 27 n.20 (discussing how both cases, first, "involved motions for leave to file partial-summary-judgment motions governed by case management orders," and, second, sought summary judgment on issues that were moot or already thoroughly litigated (citing *Interstate 10 Partners*, 2026 WL 800967, at *3–4; *Arconic*, 2020 WL 7360152, at *1). Since this case is distinguishable based on the considerations addressed by the two cases the Defendants cite, the Plaintiffs argue that any such disfavor, even if it did exist or the cases were binding, would not exist here. *See id.* (noting how no leave is required here since the Motion is brought explicitly in accordance with the Case Management Order and asserting that these issues have not previously been contested by the parties before the Court).

20. For a motion for summary judgement, the movant "bears the initial burden of demonstrating that there is no genuine dispute of material fact." *Armstrong v. Hutcheson*, 80 F.4th 508, 514 (4th Cir. 2023) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (same). If the movant overcomes this burden, the burden shifts to the nonmovant to show a material fact that is genuinely disputed. *See Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (citing *Celotex*, 477 U.S. at 325); *see also Bouchat*, 346 F.3d at 522 (same). At this stage, a movant is entitled to summary judgement if the nonmovant "fails to establish a triable issue of fact 'on an essential element of [their] case with respect to which [they] ha[ve] the burden of proof.'" *Diamondback*, 117 F.4th at 174 (citing *Celotex*, 477 U.S. at 323).

21. Either side may prevail as to the existence or nonexistence of a genuine dispute of material fact by affirmatively citing to parts of the record or by challenging the opposing side's record citations. *See* FED. R. CIV. P. 56(e). When making determinations and inferences, "[t]he evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U. S. 144, 158–59 (1970)).[56] However, "conclusory allegations or denials, without more, are insufficient." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 702 (4th Cir. 2023) (quoting *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

---

The Court concurs with the Plaintiffs on this point. Far from there being any disfavor for partial summary judgement under the federal procedure rules, the rules expressly permit and mandate courts allow partial summary judgement in the interest of judicial efficiency.

[56] *See also Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) ("On summary judgment, [courts] must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence" (citing *Anderson*, 477 U.S. at 255)).

22. As to the standard for summary judgement, a factual question can preclude summary judgement so long as it is (1) genuinely disputed and (2) material. The first criterion, genuine disputability, requires that "the evidence offered is such that a reasonable jury might return a verdict for the non-movant," *Armstrong*, 80 F.4th at 514 (quoting *Wai Man Tom*, 980 F.3d at 1037),[57] which includes, *inter alia*, when evidence is "subject to conflicting interpretations." *Hanna v. Silencio Global Inc.*, No. 3:20-cv-00144, 2020 WL 7427740, at *1 (W.D.N.C. Dec. 18, 2020). As to the second criterion, a factual dispute is material when it "might affect the outcome of the suit under the governing law," and "irrelevant or unnecessary [factual disputes] will not be counted." *Anderson*, 477 U.S. at 248; *see also Armstron*g, 80 F.4th at 514 (citing *Wai Man Tom*, 980 F.3d at 1037) (same).

23. In contrast to material factual disputes, legal disputes warrant, if not demand, a decision at the summary judgement stage, since "[t]he point of a trial, after all, is not to hash out the law." *Dupree v. Younger*, 598 U.S. 729, 735 (2023).[58] Generally, legal disputes are "issues that can be resolved without reference to any disputed facts." *Id.* Courts must grant summary judgement on such legal disputes "where it is perfectly clear that . . . inquiry into the facts is not necessary to clarify the application of the law." *McKinney v. Bd. of Trs. of Mayland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992) (citing *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)).

---

[57] *See also Red Apple Dev., LLC v. Rufus Road Partners, LLC*, No. 3:19-cv-00157, 2020 WL 1441437, at *1 (W.D.N.C. Mar. 20, 2020) (same).

[58] *See also Bradacs v. Haley*, 58 F. Supp. 3d 514, 521 (D.S.C. 2014) (discussing how the "exist[ence of] an important, difficult or complicated question of law is not a bar to a summary judgment where . . . no genuine [] material fact" exists since "[r]esolution of the legal issues will not be rendered easier by going through the trial when there is no issue of fact to be tried," such as "when the parties merely 'dispute the significance of the events . . . but do not dispute which events actually occurred'" (first quoting *Lewis v. Coleman*, 257 F. Supp. 38, 40 (S.D. W. Va. 1966); then quoting *Transamerica Delaval Inc. v. Citibank, N.A.*, 545 F. Supp. 200, 203 (S.D.N.Y. 1982))).

24. Besides legal and factual questions, courts sometimes demarcate a third category, "the so-called 'mixed question' of law and fact," which "asks whether 'the historical facts . . . satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.'" *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)).[59] However, "[m]ixed questions are not all alike." *Id.* at 395–96. On the one hand, courts treat mixed questions as legal questions routinely enough that legal questions "can reasonably encompass questions about whether settled facts satisfy a legal standard." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227–28 (2020).[60]

---

[59] *See also Pullman*, 456 U. S. at 289 n.19 (describing mixed questions as "questions in which the historical facts are admitted or established [and] the rule of law is undisputed").

[60] *See, e.g.*, *Guerrero*, 589 U.S. at 227 (proffering examples from Supreme Court treatment of mixed questions such as "[d]o the facts alleged in a complaint, taken as true, state a claim for relief under the applicable legal standard," or "did a Government official's alleged conduct violate clearly established law" (first citing FED. R. CIV. P. 12(b)(6); *Neitzke v. Williams*, 490 U. S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law"); then citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985) ("[T]he appealable issue is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law"); *Nelson v. Montgomery Ward & Co.,* 312 U. S. 373, 376 (1941) ("The effect of admitted facts is a question of law"))); *Pullman*, 456 U. S. at 289–90 (discussing how some mixed questions are "of the kind that in some cases may allow" them to be treated as pure questions of law); *Armstrong v. Hutcheson*, 80 F.4th 508, 513 (4th Cir. 2023) ("When there is no dispute about the historical facts—the who, what, where and when of what happened—the objective reasonableness of officers' conduct is a matter of law to be decided by the court. In *Scott v. Harris*, the Supreme Court said '[a]t the summary judgment stage, [] once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, [] the reasonableness of Scott's actions—or, in Justice Stevens' parlance, [w]hether [respondent's] actions have risen to a level warranting deadly force []—is a pure question of law.' (cleaned up). And since *Scott*, we have repeated that principle several times." (first quoting 550 U.S. 372, 381 n.8 (2007); then citing *Cloaninger ex rel. Cloaninger v. McDevitt*, 555 F.3d 324, 333 (4th Cir. 2009) ("The officers' conduct is thus established beyond genuine dispute. The only remaining question is whether that conduct was objectively reasonable, which is a question of law, not fact."); then citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) ("At the summary judgment stage, once we have viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law."); and then citing *Putman v. Harris*, 66 F.4th 181, 186 (4th Cir. 2023) ("To determine whether the force used was excessive, we apply a 'standard of objective reasonableness.' This is a question of law, which we judge 'from the perspective of a reasonable officer on the scene.'" (first quoting *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002); then quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)))).

25. However, on the other hand, some courts treat mixed questions more similarly to factual ones. Accordingly, the Supreme Court has recognized that whether a mixed question is treated as a legal or factual "may turn on practical considerations, such as whether the question primarily 'require[s] courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard' (often calling for review de novo), or rather 'immerse[s] courts in case-specific factual issues' (often calling for deferential review)." *Id.* at 228 (quoting *Vill. at Lakeridge*, 583 U.S. at 396). Still, the Supreme Court had also cautioned that "[t]hat a mixed question requir[ing] a court to immerse itself in facts does not transform the question into one of fact." *Wilkinson v. Garland*, 601 U.S. 209, 221–22 (2024).

**2. Fraudulent Transfers and Value**

a. Fraudulent Transfers in General and Applicable Codes

26. The current federal fraudulent transfer law was enacted in the 1978 Bankruptcy Code, as codified in Title 11 of the U.S. Code. All fifty states have enacted fraudulent transfer codes through the adoption of uniform acts promulgated by the Uniform Law Commission (the "ULC").[61] In 1918, the ULC promulgated its first uniform fraudulent transfer act, the Uniform Fraudulent Conveyance Act ("UFCA"), then in 1984 its second, the Uniform Fraudulent Transfer Act ("UFTA"), and then lastly in 2014 its third, the Uniform Voidable Transactions Act ("UVTA"). These provisions serve as the primary source of law for fraudulent transfer claims.

*i. Constructive Fraudulent Transfers and Defenses*

27. Fraudulent transfers are transactions that "treat or otherwise affect a debtor's liabilities, either purposefully or sufficiently in fact, to an extent [that] the law deems sufficiently unfair or negative as to the debtor's creditors [so] as to constitute fraud." *Order Partially Granting*

[61] Also called the National Conference of Commissioners on Uniform State Laws.

*and Sustaining and Partially Denying Plaintiffs' Privilege Motion and Defendants' Objection* ¶ 167 [Case No. 20-30080, Doc. No. 3390; Adv. Proc. No. 22-03000, Doc. No. 348] ("Privilege Order").[62] Bipartite, fraudulent transfers come in two forms: actual fraudulent transfers and constructive fraudulent transfers. Actual fraudulent transfers are transactions where the debtor executed "with actual intent to hinder, delay, or defraud" the debtor's creditors. *See* 11 U.S.C. § 548(a)(1)(A); 6 DEL. C. § 1304(a)(1); N.C. GEN. STAT. ANN. § 39-23.4(a)(1) (omitting "actual"); 12 PA. C.S. § 5104(a)(1); TEX. BUS. & COM. CODE § 24.005(a)(1).[63]

28. The second form, constructive fraudulent transfers, involve two elements. Most constructive fraudulent transfers require for their first element proof that the debtor "received less than a reasonably equivalent value" from the transaction "in exchange" for the debtor's provided consideration. *See* 11 U.S.C. § 548(a)(1)(B)(i); 6 DEL. C. § 1305(a); N.C. GEN. STAT. ANN. § 39-23.5(a); 12 PA. C.S. § 5105(a); TEX. BUS. & COM. CODE § 24.006(a). The second element—although satisfiable multimodally—is commonly met through proof of insolvency on the debtor's part either at the time of the transaction or "as a result" thereof. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I);

---

[62] *See also* Privilege Order ¶ 168 n.289 (citing, *inter alia*, *Fraudulent Conveyance*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) (defining as a "transaction" of assets either (1) intended by their owner to "place the [assets] beyond the reach of his creditors," or (2) one "which operates to the prejudice of the[] legal or equitable rights" of creditors or "of other persons, including subsequent purchasers" (citing 37 AM. JUR. 2D FRAUDULENT CONVEYANCES § 1 (1968))).

[63] Accordingly, actual fraudulent transfers thus have as their sine qua non specific allegations of the debtor's actual intent as to the transaction. *See Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002) (discussing how an "actual fraudulent [transfer] requires a purposeful act" (citation omitted)). Still, due to the difficulty of proving intent, the law has developed certain 'badges of fraud' that allow presuming fraudulent intent even without any direct evidence. Although the Bankruptcy Code does not expressly codify the badges, all state fraudulent transfer statutes codify both the badges' effect and options. *See* 6 DEL. C. § 1304(b); N.C. GEN. STAT. ANN. § 39-23.4(b); 12 PA. C.S. § 5104(b); TEX. BUS. & COM. CODE § 24.005(b). Notably, two badges of fraud, the debtor's receipt of less than reasonable equivalent value from the transaction and their contemporaneous or ensuing insolvency, see 6 DEL. C. § 1304(b)(8)–(9); N.C. GEN. STAT. ANN. § 39-23.4(b)(8)–(9); 12 PA. C.S. § 5104(b)(8)–(9); TEX. BUS. & COM. CODE § 24.005(b)(8)–(9), are also two elements that suffice in combination to prove a constructive fraudulent transfer.

6 DEL. C. § 1305(a); N.C. GEN. STAT. ANN. § 39-23.5(a); 12 PA. C.S. § 5105(a); TEX. BUS. & COM. CODE § 24.006(a).

29. Generally, the remedy for transactions that courts find to be fraudulent transfers is avoidance, which can include recovery of the transfer or unwinding of the transaction, as well as by any relief warranted by the specific circumstances under state law. *See* 11 U.S.C. §§ 548, 550(a); 6 DEL. C. §§ 1307(a)(1)–(3), 1308(b); N.C. GEN. STAT. ANN. §§ 39-23.7(a)(1)–(3), 23.8(b); 12 PA. C.S. §§ 5107(a)(1)–(3), 5108(b); TEX. BUS. & COM. CODE §§ 24.008(a)(1)–(3), 24.009(b).

30. However, a determination that a transaction constituted a fraudulent transfer does not necessarily require avoidance of the transaction as to all non-debtor parties to the transaction, given possible affirmative defenses for such parties that are available under state and federal law. 11 U.S.C. § 548(c) provides one such defense, sometimes called the "good-faith-for-value defense," which precludes a transferee of consideration from the debtor through the fraudulent transfer—be it actual or constructive—from being deprived of that consideration, so long as the transferee acted in good faith and provided value in exchange, and only to the extent of that value given by the transferee.

*ii. Background of Fraudulent Transfer Law*

31. American fraudulent transfer law is established and governed principally by statute. As the Supreme Court has canvassed, these statutes "ha[ve their] origin in the Statute of 13 Elizabeth" (the "1570 Elizabethan Statute"), "which invalidated 'covinous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others.'" *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 540 (1994) (citing 13 Eliz., c. 5 (1570)). As one commentator has laid out, while the 1570 Elizabethan Statute only expressly proscribed actual fraudulent transfers, the statute's

exclusion from that proscription of transfers for "good consideration" and made in good faith was later "construed to provide the basis for setting aside conveyances in which, although no fraudulent intent could be shown, the consideration paid to the grantor-debtor, while good enough to support a contract, was not adequate to constitute a fair exchange." Note, *Rights of Creditors in Property Conveyed in Consideration of Future Support*, 45 IOWA L. REV. 546, 547–48, 547 nn.3–5 (1960) (citing 13 Eliz. 1, c. 5 (1570); 13 Eliz. 1, c. 5, § 6 (1570); other citations omitted).[64]

32. On the federal level, historically all bankruptcy laws "ha[ve] incorporated a fraudulent transfer provision," with § 67(e) of 1898 Bankruptcy Act "specifically adopt[ing] the language of the [1570 Elizabethan Statute]." *BFP*, 511 U.S. at 541 (citing Bankruptcy Act of July 1, 1898, ch. 541, § 67(e), 30 Stat. 564–565). Thus, § 67(e), while not the first in America or on the federal level, was the first permanent fraudulent transfer statute nationally formulated and the earliest direct progenitor of the modern fraudulent transfer statutes in America.[65] Section 67(e) was followed on the state level by UFCA, which borrowed significantly from § 67(e) but with substantial revisions and additions. *Id.* After many states enacted UFCA, in 1938, Congress substantially revised § 67(e) of 1898 Bankruptcy Act to closely mirror the language in the UFCA. *See infra* ¶ 34.

---

[64] *See also* Note, *Rights of Creditors in Property Conveyed in Consideration of Future Support*, 45 IOWA L. REV. 546, 548, 548 nn.6–8 (1960) [hereinafter *Rights of Creditors*] (describing two early rationales for constructive fraudulent transfers as being that inadequate consideration constituted evidence negating the transferee's good faith or that the excess value transferred constituted a transfer for no consideration, sometimes called a voluntary conveyance, while conjecturing "the real reason underlying these rulings" was simply that such conveyance depleted assets otherwise available to creditors, which "properly saved the [1570 Elizabethan Statute] from nullification by the difficulties of proof presented by a transfer for some but not adequate consideration" (citations omitted)).

[65] While the 1898 Bankruptcy Act was "the first permanent American bankruptcy law," *In re Bestwall LLC*, 658 B.R. 348, 366–67 (Bankr. W.D.N.C. 2024), it followed three prior short-lived bankruptcy codes. *See In re Marshall*, 300 B.R. 507, 513-14 (Bankr. C.D. Cal. 2003) (discussing how Congress passed bankruptcy codes in 1800, 1841, and 1867, but repealed the first two within two years and the third after about a decade (citations omitted)).

33. By the end of the 1960s, the need for significant reform to the fraudulent transfer provisions in the 1898 Bankruptcy Act was apparent. In 1978 Congress overhauled the 1898 Bankruptcy Act with its passage the Bankruptcy Reform Act of 1978, which enacted the modern Bankruptcy Code that, as subsequently amended, remains in force today. *See Bestwall LLC*, 658 B.R. at 367. The 1978 Bankruptcy Code stemmed from almost a decade of work by government advisors and officials. The most notable contributions came from the Commission on the Bankruptcy Laws of the United States (the "Bankruptcy Commission"), which Congress authorized in 1970 through the *Joint Resolution to Create a Commission to Study the Bankruptcy Laws of the United States*, Pub. L. No. 91-354, 84 Stat. 468 (1970). After three years of work, the Bankruptcy Commission released its report in 1973 (the "1973 Report"). The 1973 Report not only provided thorough commentary on the 1898 Act and its effects, but also directly proposed language that ultimately became a new bankruptcy code.

34. Regarding the fraudulent transfer provisions, the Bankruptcy Commission criticized the pre-1978 bankruptcy code's fraudulent transfer provisions as generating "[s]ubstantial complexity" due to its drafters attempted incorporation of the UFCA's language. *See* 1973 Commission Report, pt. 1, at 211, n.181 (citing Analysis of H.R. 12889, Committee Print, 74th Cong., 2d Sess. 204-05 (1936)); 1973 Commission Report, pt. 2, at 176 (citing same). Accordingly, the Bankruptcy Commission recommended "a substantial simplification" of the fraudulent transfer provisions using "terminology [] no longer track[ing] that of [UFCA]." *See* 1973 Commission Report, pt. 1, at 211. Accordingly, the Bankruptcy Commission provided various changes to the language and definitions within the Bankruptcy Code. Congress ultimately adopted many of the recommendations of the Bankruptcy Commission with the passage of the Bankruptcy Reform Act of 1978.

35. Following the passage of the Bankruptcy Reform Act of 1978, ULCA promulgated UFTA in 1984. While UFTA substantially borrowed from the 1978 Bankruptcy Code, it differed materially not only where interests differed (i.e., on the state level compared to the federal level) but also where the drafters of UFTA simply disagreed with the language of the 1978 Bankruptcy Code. Lastly, UFTA was succeeded by UVTA in 2014. While UFTA had substantially overhauled and replaced UFCA, UVTA's changes to UFTA were far more narrow and surgical, and did affect any provisions at issue here.

*iii. Statutory Interpretation in General and in the Fraudulent Transfer Context*

36. Fraudulent transfer analysis largely involves statutory interpretation, which, "[a]s with all such questions, [] begin[s] with the plain language of the Code." *In re Derivium Cap. LL*C, 716 F.3d 355, 363 (4th Cir. 2013) (considering "[w]hether brokers' commissions and fees can be shielded from avoidance and recovery as a 'settlement payment' under 11 U.S.C. § 546(e)"). When interpreting statutes, "[t]he plain meaning of" the statute's text "should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42 (1989) (citation omitted). For the plain meaning of "a term [] undefined in a statute, [courts] give the term its ordinary meaning" which often involves dictionary consultation. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

37. However, ordinary meaning does not necessarily end the analysis. First, the ordinary meaning considered is what was "commonly understood . . . at the time [of] enact[ment]" and not merely the current understanding. *New York v. Nat'l Highway Traffic Safety Admin.*, 974

F.3d 87, 95 (2d Cir. 2020).[66] Second, courts must consider this ordinary meaning "with a view to [the phrases'] place in the overall statutory scheme." *Id*. These required considerations necessitate that courts view undefined phrases in accordance with dictionary definitions or authoritative case law published around the time when a statute was passed, to supplement any precedential interpretation of the statute post-enactment. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). Third, the use of legal terms of art can denote specialized and sometimes even non-ordinary meanings because courts presume that the legislature "knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *See FAA v. Cooper*, 566 U.S. 284, 292 (2012) (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992)).

b. The Value Statutes under 11 U.S.C. § 548(d)(2)(A)

38. The value statutes provide the meaning of the term 'value' for purposes of a fraudulent transfer action through two different mechanisms. First, the statutes provide that value can constitute one of two broad categories: value may comprise property (the "Property Phrase"), or it may comprise the satisfaction or securing of debt (the "Debt Phrase," and, together with the Property Phrase, the "Defining Clauses"). Second, through the excluded promise clauses, the value statutes exclude certain "promises" from what can constitute value for a fraudulent transfer,

---

[66] *But see, e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration. . . . To be sure, the statute's application [of the term 'sex' to encompass sexuality and gender identity] reaches 'beyond the principal evil' legislators may have intended or expected to address. But '[t]he fact that [a statute] has been applied in situations not expressly anticipated by Congress' does not demonstrate ambiguity; instead, it simply 'demonstrates [the] breadth' of a legislative command. And 'it is ultimately the provisions of' those legislative commands 'rather than the principal concerns of our legislators by which we are governed.'" (citing A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (2012) (noting that unexpected applications of broad language reflect only Congress's "presumed point [to] produce general coverage—not to leave room for courts to recognize ad hoc exceptions") (other citations omitted))).

namely, those meeting three criteria: promises that (1) are "of support," (2) are "unperformed," and (3) are "to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). The state excluded promise clauses add one wrinkle: a promise can evade being encompassed by the state excluded promise clauses only if it was "made [] in the ordinary course of the promisor's business." 6 DEL. CODE § 1303(a); N.C. GEN. STAT. § 39-23.3(a); 12 PA. CONS. STAT. § 5103(a); TEX. BUS. & COM. CODE ANN. § 24.004(a).

39. The state excluded promise clauses only contain additional language to the federal excluded promise clause, namely, the ordinary course of business phrase, rendering that phrase an additional requirement on top of the federal excluded promise clause. Accordingly, a court's application of the state excluded promise clauses requires assessment of both the federal excluded promise clause, and the addition of the ordinary course of business phrase secondarily. Therefore, the state excluded promise clauses can only ever apply where the federal excluded promise clause also applies but may not apply in some instances even where the federal version does apply. Put differently, because the ordinary course of business phrase is an exclusion of an exclusion, if the federal excluded promise clause does not apply, the state excluded promise clause also cannot apply.

*i. Background*

40. The federal excluded promise clause did not constitute novel law when it was first enacted into the Bankruptcy Code in 1978, nor when it was first proposed by the Bankruptcy Commission in 1973. Rather, the excluded promise clauses directly followed and were derived from over two centuries of fraudulent transfer common law decisions regarding executory consideration. That case law, while frequently divergent, had as its main thrust the view that certain

executory consideration rendered a transaction fraudulent.[67] It is unclear when and from where this rule originated.[68] Some courts treated the executory consideration as contributing evidence, if

[67] *See* ORLANDO F. BUMP, FRAUDULENT CONVEYANCES 218–219, 218 n.4, 219 n.1 (3d ed. 1882) (canvassing a multitude of case law holding that "[a]n agreement to support the debtor or his family . . . is not sufficient to uphold a transfer when the [debtor] is insolvent" or "enough is not left for the payment of the[ir] debts" (citing *Russell v. Hammond*, 26 Eng. Rep. 9, 10 (1738); *Jackson v. Parker*, 1828 N.Y. LEXIS 329; *Geiger v. Welsh*, 1 Rawle 349 (Pa. 1829); *Johnston's Heirs v. Harvy*, 2 Pen. & W. 82 (Pa. 1830); *Gunn v. Butler*, 35 Mass. 248 (1836); *Smith v. Smith*, 11 N.H. 459 (1841); *Crane v. Stickles*, 15 Vt. 252 (1843); *Albee v. Webster*, 16 N.H. 362 (1844); *Rollins v. Mooers*, 25 Me. 192 (1845); *Webster v. Withey*, 25 Me. 326 (1845); *Tyner v. Somerville*, 1 Ind. 190 (1848); *Hawkins v. Moffitt*, 49 Ky. 81 (1849); *Sturdivant v. Davis*, 31 N.C. 365 (1849); *Stokes v. Jones*, 18 Ala. 734 (1851); *Henderson v. Downing*, 24 Miss. 106 (1852); *Robinson's Ex'rs v. Robards*, 15 Mo. 459 (1852); *Miner v. Warner*, 2 Grant 448 (Pa. 1854); *Robinson v. Stewart*, 10 N.Y. 189 (1854); *McLean v. Button*, 1854 N.Y. App. Div. LEXIS 139; *Bott v. Smith*, 52 Eng. Rep. 957 (Ch. 1856); *Hunt v. Knox*, 34 Miss. 655 (1857); *Church v. Chapin*, 35 Vt. 223 (1862); *Coolidge v. Melvin*, 42 N.H. 510 (1861); *Stanley v. Robbins*, 36 Vt. 422 (1863); *Morrison v. Morrison*, 49 N.H. 69 (1869); *Graham v. Rooney*, 42 Iowa 567 (1876); *Annis v. Bonar*, 86 Ill. 128 (1877); *Henry v. Hinman*, 25 Minn. 199 (1878); *Egery v. Johnson*, 70 Me. 258 (1879); *Graves v. Blondell*, 70 Me. 190 (1879); *Stearns v. Gage*, 79 N.Y. 102 (1879); *Todd v. Monell*, 19 Hun 362 (N.Y. Sup. Ct. Gen. Term 1879); *Tupper v. Thompson*, 26 Minn. 385, 4 N.W. 621 (1880); *Woodward v. Wyman*, 53 Vt. 645 (1881))); MELVILLE MADISON BIGELOW, THE LAW OF FRAUDULENT CONVEYANCES 567, 567 n.1, 567 n.a (Kent Knowlton ed., 1911) (discussing how executory consideration can render a transaction a fraudulent transfer where "the promise [] to pay money[] is by a person known to be without means or the ability to provide means," as well when it is "in the form of a promissory note or otherwise, [] even when the grantee is a responsible person," in some circumstances (citing in support *Perkins v. Webster*, 56 Mass. 480 (1848); *Ringgold v. Waggoner*, 14 Ark. 69 (1853); *Leach v. Fowler's Devisees*, 22 Ark. 143 (1860); *Blair v. Alston*, 26 Ark. 41 (1870); *Peebles v. Horton*, 64 N.C. 374 (1870); *Nicol & Davidson v. Crittenden*, 55 Ga. 497 (1875); *Massie v. Enyart*, 32 Ark. 251 (1877); *Thames & Co. v. Rembert's Adm'R*, 63 Ala. 561 (1878); *Jaffers v. Aneals*, 91 Ill. 487 (1879); *Whelan v. McCreary*, 64 Ala. 319 (1879); *Bell v. Devore*, 96 Ill. 217 (1880); *Knowlton v. Hawes*, 10 Neb. 534, 7 N.W. 286 (1880); *Gregg v. Lee & Co.*, 37 La. Ann. 164 (1885); *Earnshaw v. Stewart*, 64 Md. 513 (1886); *Jackson v. Harby*, 65 Tex. 710 (1886); then citing in opposition *Beasley v. Bray*, 98 N.C. 266, 3 S.E. 497 (1887); then citing *Barnes v. Reilly*, 81 Mich. 374, 45 N.W. 1016 (1890); *Seger's Sons v. Thomas Bros.*, 107 Mo. 635, 18 S.W. 33 (1891); *Hall & Farley v. Ala. Terminal & Improv. Co.*, 143 Ala. 464 (1904); *Howell v. Crawford*, 89 S.W. 1046 (Ark. 1905))); 1 GARRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES 474, 474 n.25 (rev. ed. 1940) ("A transfer by a debtor, insolvent or left insolvent in consequence, in consideration of the grantee's agreement to support the debtor for life, is a fraudulent conveyance as matter of law" (citing *Church*, 35 Vt. 223; *Egery*, 70 Me. 258; *Good-man v. Wineland*, 61 Md. 449 (1883); *Davidson v. Burke*, 143 Ill. 139 (1892); *Rolfe v. Clarke*, 224 Mass. 407 (1916))); *Rights of Creditors*, *supra* note 64, at 550, 550 n.17 (discussing how, as early as the mid- to late 19th Century, there was "general agreement that a conveyance in consideration of an executory promise of future support is voidable by creditors under the common law and various statutes" (citing in support *Church*, 35 Vt. at 229; *Mallow v. Walker*, 115 Iowa 238, (1901); *Ludlow Sav. Bank & Trust Co. v. Knight*, 92 Vt. 171, 173 (1917); GLENN, *supra*, at § 277; and then citing in opposition *In re Johnson*, 20 Ch. D. 389 (1881); *Farlin v. Sook*, 30 Kan. 401 (1883); *Neilson v. Larson*, 158 Minn. 305 (1924); *Ayer v. First Nat'l Bank & Trust Co.*, 182 Ga. 765 (1936); *Avary v. Avary*, 41 S.E2d 314 (Ga. 1947))).

[68] *Compare* BUMP, *supra* note 67, at 219, 219 n.2–3 (sourcing the excluded promise rule to a view that a transfer for executory consideration plus the insolvency required is, "in effect, a transfer to the use of the [debtor], which is always void," with "[t]he gist of the objection consist[ing], not in the amount to be paid in future support, but in the fact that the promise of future support forms part of the consideration as an inducement to the transfer" (citing

not per se evidence, of fraudulent intent due to the inherent suspicion from the consideration's circumstances.[69] Other courts viewed the executory consideration involved as fraudulent based on the bare fact that, regardless of the intent of the parties involved, creditors' recovery rights were inherently undermined by an exchange of the debtor's assets for certain executory consideration.[70]

---

*Cadogan v. Kennett*, 98 Eng. Rep. 1171 (1776); *Anonymous*, 73 Eng. Rep. 663 (K.B. 1570) (Dyer 295a); *Sidensparker v. Sidensparker,* 52 Me. 481 (1864); *Adams v. Adams*, 1879 Ky. LEXIS 234; *Graves v. Blondell*, 70 Me. 190 (1879); *Moore v. Wood*, 100 Ill. 451 (1881))), *with* GLENN, *supra* note 67, at 475, 475 n.28 (explaining that a debtor creates a fraudulent, private exemption from creditors by exchanging reachable property for a nonassignable executory consideration of support payments since it unfairly depletes the estate, and, "even if [] the creditor could get at [] the support-money," it deprives creditors of the "facility for collecting [their] debt" (quoting *Church*, 35 Vt. 223)), with *Rights of Creditors*, *supra* note 64, at 550–552, 550–552 nn.20–30 (canvassing that the bases for transfers in exchange for executory consideration constituting fraudulent transfers included that such consideration constituted (1) a badge of fraud, a presumption of fraud, or fraud itself, (2) a voluntary conveyance, (3) a secret trust established by the debtor for his own benefit, or (4) a private exemption, while positing "the principal public policy reason[]" for these rules as to fraudulent transfers being that a debtor should not be permitted to exchange presently reachable property for an executory promise of future support, thereby diminishing the property available to satisfy creditors' claims, substituting a presently nonenforceable or unavailable future benefit for an asset creditors could have reached, and hindering or delaying collection (first citing in support *Henry*, 25 Minn. 199; *Goodman*, 61 Md. 449; *Hays v. Montgomery*, 118 Ind. 91 (1889); *Merithew v. Ellis*, 116 Me. 468 (1917); *Smith v. Clark*, 242 Mass. 1 (1922); *Schmitz v. Wentzel*, 166 Minn. 435 (1926); *Castleton v. Peterson*, 85 Cal. App. 51 (1st Dist. 1927); *Grimes Say. Bank v. McHarg*, 224 Iowa 644 (1937); *Kahre v. McCourtney*, 204 Ark. 272 (1942); *Westminster Say. Bank v. Sauble*, 183 Md. 628 (1944); *In the Matter of Nat'l City Bank*, 269 App. Div. 1040 (1945); *Leonardo v. Leonardo*, 251 F.2d 22 (D.C. Cir. 1958); *Royal Indem. Co. v. McClendon*, 64 N.M. 46 (1958); in opposition *Nat'l Valley Bank v. Roudabush*, 170 Va. 528 (1938); then citing in support *Pursel v. Armstrong*, 37 Mich. 326 (1877); *Seekel v. Winch*, 108 Iowa 102 (1899); *Bank of Willow Springs v. Lillibridge*, 316 Mo. 968 (1927); *Grimes*, 224 Iowa at 648; in opposition *Ayer*, 182 Ga. 765; *Wallace v. Williams*, 212 Ga. 692 (1956); then citing *Allard v. La Plain*, 152 Wash. 211(1929); *Townsend v. McGrain*, 43 N.J. Super. 438 (Ch. 1957); BIGELOW, *supra* note 67, at 547; then citing in support *Church*, 35 Vt. at 229; Mallow, 115 Iowa 238; *Goodrich v. Bagnell Timber Co.*, 105 Ark. 90 (1912); *Kahre*, 204 Ark. 272; in opposition *Cherokee Auto Co. v. Stratton*, 210 Iowa 1236 (1930))).

[69] *See, e.g.*, *Slater v. Dudley*, 35 Mass. 373, 375–76 (1836) (describing how a debtor's transfer of all his assets to his son in exchange for the son's obligation under a written contract of "support and maintenance of the [debtor] and his wife [] was prima facie evidence of fraud"); *Smith*, 11 N.H. at 464-66; *Crane*, 15 Vt. at 257.

[70] *See, e.g.*, *Jackson*, 1828 N.Y. LEXIS 329 (1828) (holding that executory consideration in the form of future utilization of a debtor's assets in exchange for that consideration infringed "creditors['] [] right[s] to have appropriated [the assets] to the payment of [the] debts" on the creditor's terms); *Gunn*, 35 Mass. at 251–52 (finding a fraudulent transfer not only on the basis that the terms of the contract exchanged for the assets required payments for debts at a later time, but also separately because "the rights of creditors are not to be affected by a mere executory contract of the debtor with a third person, to pay the debts for him"); *Royal Indem. Co.*, 64 N.M. at 49 (stating that, "[b]y the weight of authority a transfer of property in consideration of future support is held to be invalid when the rights of existing creditors are thereby prejudiced"); *see also* BIGELOW, *supra* note 67, at 567 n.a (discussing how a transfer in exchange "a promise to pay, in the form of a promissory note or otherwise, may be objectionable [] because it substitutes for tangible property easily reached by creditors a species of property not so

Courts appeared to have been split on whether the executory consideration was fraudulent due to its sufficiency as evidence of fraudulent intent or due to questions as to the certainty of its purported value.[71] Finally, later courts developed the view, which the modern excluded promise clause most closely embodies, that the uncertainty of certain executory consideration precludes its ability to sufficiently constitute value for a fraudulent transfer action.[72] Lastly, as to the procedure involved, although many of these courts applied the excluded promise rule as a matter of law,[73] courts did not do so unanimously, with some courts expressly requiring the determination be made by a trier of fact.[74]

41. Three points must be made as to this common law that are critical in understanding the excluded promise clauses of today. First, these decisions were the first to use the terms 'promise' and 'support' to describe the fraudulent executory consideration,[75] from which it appears

---

readily accessible" (citing *Barnes v. Reilly*, 81 Mich. 374 (1890); *Seger's Sons v. Thomas Bros.*, 107 Mo. 635 (1891))).

[71] Indeed, as to the view that executory consideration was fraudulent due to fraudulent intent, many courts and commentators expressly recognized that the executory consideration at issue had actual value to the debtor, but nevertheless found the existence of a fraudulent transfer. *See supra* note 70.

[72] *See, e.g.*, *Royal Indem. Co.*, 64 N.M. at 49 (affirming that a transfer of all the debtors' assets in exchange for a promise of support from the transaction counterpart "constituted a conveyance upon a glaring inadequacy of consideration"); *Townsend*, 43 N.J. Super. at 440–41; *Westminster*, 183 Md. at 631–32 (holding that "when a person conveys property in consideration of an agreement to support him in the future, and by the conveyance renders himself unable to pay his debts," the conveyance was fraudulent," "[n]ot only [because] such a conveyance, until support is actually furnished, have the infirmity of an executory agreement, but it is presumed as a matter of law that the grantor had fraudulent intent, and that the grantee had knowledge of the grantor's indebtedness (citing *Wilmer v. Placide*, 102 A. 541 (Md. 1917), 543; *Ludlow*, 92 Vt. at 172–74)).

[73] *See, e.g.*, *Geiger*, 1 Rawle at 353 (holding that the form of consideration involved made the question of the transfer's fraudulency one which "the court had the right to decide, and not the jury"); *Townsend*, 43 N.J. Super. at 440–41.

[74] *See, e.g.*, *Slater*, 35 Mass. at 375–76 (affirming jury's finding of no fraudulent transfer since although a debtor's transfer of all his assets to his son in exchange for the son's obligation to pay the debtor and his wife's expenses "was prima facie evidence of fraud," the jury was entitled to disregard that evidence); *Royal Indem. Co.*, 64 N.M. at 48, 50.

[75] *See, e.g.*, *Jackson*, 1828 N.Y. LEXIS 329 at *13; *Wood*, 8 Wend. at 20; *Robinson*, 10 N.Y. 189 (syllabus); *Sidensparker*, 52 Me. at 490–91; *Rice*, 116 Mass. at 470; *Pursel*, 37 Mich. at 330; *Tupper*, 26 Minn. at 386; *Woodward*, 53 Vt. At 647; *Woodall*, 85 Ala. at 375; *Walker*, 106 Mich. at 26; *Rolfe*, 224 Mass. at 411 (citing *Gunn*,

the Bankruptcy Commission later sourced its language for the proposed excluded promise clause that ultimately became the enacted statutory language. Second, a litany of these courts found transactions to be fraudulent based on the presence of certain executory consideration despite explicitly recognizing that the executory consideration involved constituted actual value (at least to the parties).[76]

42. Third, and most important, courts never automatically applied the rule to any transaction involving executory consideration. While executory consideration was necessary element for the rule's application, it was not by itself sufficient to prove a fraudulent transfer. Courts commonly applied the excluded promise rule in the context of intrafamilial executory consideration.[77] However, courts also consistently considered the rule in the context of commercial contracts when similar concerns existed as to the consideration's uncertain value.[78] Of course, some courts did rely on the consideration's occurrence in the intrafamilial transfer context as

---

35 Mass. 248); *Castleton*, 85 Cal. App. at 53; *Cherokee*, 210 Iowa at 1240; *Ayer*, 182 Ga. at 767; *Grimes*, 224 Iowa at 648; *Nat'l Valley Bank*, 170 Va. at 533; *Nat'l City Bank*, 269 App. Div. 1040; *Avary*, 202 Ga. at 29.

[76] *See, e.g.*, *Geiger*, 1 Rawle at 349 (holding that although a transfer "in consideration, or on condition of supporting the grantor for life [] would have been, as to them, a valuable consideration," it constituted an actual fraudulent transfer as a matter of law); *see also* BUMP, *supra* note 67, at 218–219, 218 n.4, 219 n.1 (discussing how courts found the executory consideration to be fraudulent despite the recognized fact that such "is a valuable consideration").

[77] *See, e.g.*, *Jackson*, 1828 N.Y. LEXIS at 329; *Gunn*, 35 Mass. at 248; *Slater*, 35 Mass. at 375–76; *Albee*, 16 N.H. at 362; *Geiger*, 1 Rawle at 349; *Westminster*, 183 Md. at 631–32; *Townsend*, 43 N.J. Super. at 439; *Royal Indem. Co.*, 64 N.M. at 48.

[78] *See, e.g.*, *Smith*, 11 N.H. at 459; *Crane*, 15 Vt. at 257; *Allard*, 152 Wash. at 213, 217–218; *Castleton*, 85 Cal. App. at 52–54; *see also Rights of Creditors*, *supra* note 64, at 555, 555 nn.44–46 (explaining how the fact that courts appear more willing to uphold executory consideration to "institutional grantees" does not mean "the relationship of the parties to a transaction" determines whether the transaction is fraudulent, since although "a close personal or family relationship between the parties "raises a presumption of fraud or at least constitutes a badge of fraud," "a close personal relationship does not control[], however, as conveyances for future support have been invalidated when the grantee had nothing more than a business association with the debtor," and explaining that "the close relationship between the grantor and grantee in many of these transactions is merely a result of the nature of a promise for future support," given someone "seeking to provide for his future support would turn to his most trusted friend, relative, or personal advisor and not to a stranger" (citations omitted)).

constitutively problematic, wherefore it does appear that intrafamilial executory consideration comprised the usually quintessential example of the fraudulent transfer based on executory consideration.

43. Courts during this period declined to apply the excluded promise rule where the executory consideration stemmed from arms-length negotiations and a good-faith bargain between the parties, particularly when the consideration was in the form of employed services,[79] where the consideration was made in the ordinary course of the promisor or the promisee's business,[80] when transfer had been done in a way whereby creditors could still levy the assets transferred in

[79] *See, e.g.*, *Faulkner v. Waters*, 28 Mass. 473, 474–75 (1831) (finding no fraudulent transfer where a debtor deposited under an employment contract funds with his employers as security for any loss incurred by the employers from the venture that the debtor was specially employed for and the employers had invested into under the contract; finding the contract was "not [] unusual or fraudulent" since the debtor "had skill," the employers "had property," the debtor "desirous of obtaining employment and having confidence in the success of his enterprise, agreed" to the terms, wherefore the "contract [], at the time, apparently mutually beneficial to the parties;" holding that because "[t]his [was] in itself a reasonable and lawful contract," the debtor's creditors could not avoid the contract and "[t]he parties had a right, for a reasonable time at least, to proceed in the execution of their agreement"); BUMP, *supra* note 67, at 220, 220 n.2 (noting how executory consideration "to employ the [debtor]" "may" suffice to make a transfer not fraudulent (citing *Griffin v. Cranston*, 10 Bosw. 1 (N.Y. Super. Ct. 1862)). *But cf.* BIGELOW, *supra* note 67, at 570 n.a ("The question [of executory consideration in the fraudulent transfer context] frequently arises regarding the assignment of property for future services, usually to an attorney. It has been held that the attorney can hold the property only as a security for services that he has performed before the intervention of creditors. Other courts allow such assignments for future services in particular matter. Here the attorney will be allowed only for services performed before notice of the claims of creditors" (first citing *Swift v. Hart*, 35 Hun 128 (N.Y. Sup. Ct. Gen. Term 1885); *Shideler v. Fisher*, 57 P. 864 (Colo. 1899); then citing *Crain v. Gould*, 46 Ill. 293 (1867); *Reed v. Mellor*, 1878 Mo. App. LEXIS 65; *In re Parsons*, 23 N.E. 50 (Mass. 1890); *Morrell v. Miller*, 43 P. 490 (Or. 1896); then citing *Winfield Nat'l. Bank v. Croco*, 26 P. 942 (Kan. 1891); *Crain*, 46 Ill. 293)).

[80] *Rights of Creditors*, *supra* note 64, at 554, 554 n.42 ("The purchase of an annuity contract by an insolvent debtor has likewise been upheld as to creditors. These cases may, however, be explained by the fact that the grantees were [] commercial establishments whose business depends upon transactions for future support. Certainly it would be easier for a home for the aged or an insurance firm to establish good faith in such a case. Because the consideration paid to such a grantee is based on actuarial tables, it would be difficult to challenge the adequacy of the return consideration" (citing *Osgood v. Mass. Mut. Life Ins. Co.*, 93 N.H. 160, 37 A.2d 12 (1944); *Rinn v. N.Y. Life Ins. Co.*, 89 F.2d 924 (7th Cir. 1937); *Rishel v. Pacific Mut. Life Ins. Co.*, 78 F.2d 881 (10th Circ. 1935))).

exchange,[81] or where the executory consideration was enforceable,[82] although not always.[83] As those examples where the rule did not apply should evince, courts in general applied the rule to executory consideration made in the commercial context less frequently. However, given the fact that courts did sometimes apply the excluded promise rule in the commercial context, the rule under the common law was not exclusively limited to the intrafamilial transfer context.

*ii. Drafting and Passage*

44. In 1973, the Bankruptcy Commission proposed the first statutory provision for the excluded promise clause. The Bankruptcy Commission described the clause as "new" and as intended to define value "so as to require an increase in the assets of the debtor or a reduction in the liabilities of the debtor," which would "make[] it clear that the value must enhance the financial position of the debtor." 1973 Commission Report, pt. 1, at 211, n.180. Thereafter, Congress first enacted the excluded promise clause in the 1978 Bankruptcy Code's new value statute. While Congress altered the defining clauses substantially in the 1978 Bankruptcy Code, it adopted the excluded promise clause as proposed by the Bankruptcy Commission without significant edits.

---

[81] *See Smith*, 11 N.H. at 464–66 (suggesting consideration in part because the form of a "bond and mortgage for [the debtor's] maintenance during life" could be protected from being voided so long as the transaction party providing such consideration in exchange for the debtor's assets "show[s] that full means for that object were left in the possession of the grantor, which the creditors may levy upon, or have lost by their own negligence").

[82] *See, e.g.*, *Slater*, 35 Mass. at 375–76 (affirming a finding of no fraudulent transfer where the transaction counterparty had not fulfilled his duties as of the time of the transfer as obliged by the contracted underpinning the transaction, since that later performance was "but a slight circumstance" given that the counterparty had "agreed to" perform as he later did, "and that agreement was binding"); *Dyer v. Homer*, 39 Mass. 253, 261–62 (1839) (finding no fraudulent transfer where the executory consideration was in the form of "a contract good and valid as between the parties" that is a "note [] payable to the vendors only and not to order, [] not a security which any one by law could take, otherwise than as taking a right to recover the same amount that the assignors had a right to recover, at the time of the assignment," since such executory consideration is distinguishable "from the cases of 4 Greenleaf 415, and 7 Conn. 399, . . . [where] the notes were made for the purpose of enabling the promisee to hold out a false appearance of contract when there was no real contract").

[83] *See Gunn*, 35 Mass. at 251–52 (rejecting that value existed based on the "terms of the contract" obliging the counterparty to provide the covenant funds rendered the transfer nonfraudulent given other surrounding circumstances).

45. Next, in 1983, UFTA incorporated the excluded promise clause, ostensibly following the lead of the 1978 Bankruptcy Code.[84] However, the version of UFTA that was originally proposed was quite different from the ultimate resulting statutory provision. Instead of simply denoting and excluding certain promises from value, the language of UFTA's original proposal gave substantial context to the excluded promise clause provisions. First, the original proposed UFTA made the excluded promise clause its own subsection in the statute. That subsection additionally listed four promises not encompassed by the version of the excluded promise clause ultimately enacted by Congress: promises that (1) "may be exchanged for money or money's worth," (2) are "enforceable at law or in equity," (3) are "made in the ordinary course of the promisor's business," or (4) where avoidance would not make possible restoring the promisor's former position. 1973 Commission Report, Minutes at 43. Second, the original proposed UFTA provided certain executory contractual interests which would have constituted value. *Id.* at 43–44.

46. The UFTA committee members discussed this language at length, and some members viewed the detail included in UFTA's original proposal as unnecessary at best given that

---

[84] *But see* Peter A. Alces & Luther M. Dorr, Jr., *A Critical Analysis of the New Uniform Fraudulent Transfer Act*, 1985 U. ILL. L. REV. 527, 601 nn.106–108 (1985) (discussing how some "[c]ourts construing the UFCA have concluded that an executory promise is not within the Act's definition of fair consideration" and "have rejected some promises to discharge the debtor's obligations or to support the debtor for life as inadequate value," while "[o]ther UFCA decisions, however, have reached the opposite result" (first quoting *Hulsether v. Sanders*, 223 N.W. 335 (S.D. 1929) (promise to discharge mortgage and support debtor held insufficient); and then quoting *Angers v. Sabatinelli*, 293 N.W. 173 (Wis. 1940) (interpreting section to exclude any executory promise not embodied in a negotiable instrument already negotiated to a holder in due course); then citing James McLaughlin, *Application of the Uniform Fraudulent Conveyance Act*, 46 HARV. L. REV. 404, 404–05 (1933) (concluding that executory promise is not fair consideration under unequivocal language of UFCA § 3); *Sandler v. Parliapiano*, 258 N.Y.S. 88 (1932) (promise of future support held insufficient); *Cooper v. Cooper*, 124 S.W.2d 264 (Tenn. App. 1938) (promise to pay criminal judgment, support for life, and pay for funeral expenses held insufficient); *Freitag v. Strand of Atlantic City, Inc.*, 205 F.2d 778 (3d Cir. 1953) (finding that executory promise may be "property" and "fair consideration"); *Hollander v. Gautier*, 168 A. 860 (N.J. 1933) (deciding enforceable promise may constitute fair consideration under UFCA)); *Rights of Creditors*, *supra* note 64, at 550–62)).

ordinary course could arguably cover all the components of the original proposal. Some members also viewed the language in the original UFTA proposal as problematically worded and likely to create internal inconsistencies for some promises such a guaranties. The UFTA committee subsequently modified the excluded promise clause and settled on the simpler version officially promulgated in 1984, which UVTA repromulgated without edit, and which forty-five states have now made part of their fraudulent transfer codes.

*iii. Case Law on the Value Statutes and the Excluded Promise Clauses*

47. Formal enactment of the excluded promise rule into the fraudulent transfer codes has not precluded continued judicial confusion and inconsistency as to its coverage.[85] While courts continued to routinely apply the excluded promise clause to intrafamilial executory consideration, sometimes as a matter of law,[86] or sometimes after a trial,[87] courts also declined to apply it in every

[85] *See, e.g.*, DAVID G. EPSTEIN, STEVE H. NICKLES & JAMES J. WHITE, BANKRUPTCY 374 (1993) (describing the federal value statute as "surprisingly uncertain and confused [] on the seemingly basic issue whether the term includes an executory promise").

[86] *See, e.g.*, *VanCampen v. United States ex rel. IR*S, 1997 U.S. Dist. LEXIS 11384 (D. Kan. July 9, 1997); *Simione v. Nationsbank of Del., N.A.* (*In re Simione*), 229 B.R. 329 (Bankr. W.D. Pa. 1999); *Lawson v. Barden (In re Skalski)*, 257 B.R. 707 (Bankr. W.D.N.Y. 2001); *Hahn v. Leong* (*In re Llamas*), 2011 Bankr. LEXIS 4779 (Bankr. C.D. Cal. Dec. 12, 2011); *Silagy v. Morris* (*In re Morris*), 2013 Bankr. LEXIS 4369 (Bankr. N.D. Ohio Oct. 18, 2013); *Kane v. Tin-Lo Chu* (*In re Hung Chung Chu*), 2014 Bankr. LEXIS 2463 (Bankr. D. Haw. June 5, 2014); *Schlant v. Smierciak* (*In re Creeley*), 644 B.R. 264 (Bankr. W.D.N.Y. 2022); *DWC3, Inc. v. Kissel*, 246 N.C. App. 361, 784 S.E.2d 237 (2016); *Gonzales v. Sexton* (*In re Esquibel*), 2018 Bankr. LEXIS 2155 (Bankr. D.N.M. July 23, 2018); *Silagy v. Schroeder* (*In re Schroeder*), 2017 Bankr. LEXIS 420 (Bankr. N.D. Ohio Feb. 14, 2017); *SE Prop. Holdings, LLC v. Center*, 2016 U.S. Dist. LEXIS 180248 (S.D. Ala. Dec. 30, 2016); *Renneker v. Wyman* (*In re Wyman*), 626 B.R. 480 (Bankr. S.D. Ohio 2021).

[87] *See, e.g.*, *Zubrod v. Kelsey* (*In re Kelsey*), 270 B.R. 776 (B.A.P. 10th Cir. 2001); *Sergeant v. G.R.D. Invs. L.L.C.* (*In re Schaefer*), 331 B.R. 401 (Bankr. N.D. Iowa 2005); *Bayer Emples. Fed. Credit Union v. Sapp* (*In re Sapp)*, 364 B.R. 618 (Bankr. N.D.W. Va. 2007); *Hasse v. Rainsdon* (*In re Pringle*), 495 B.R. 447 (B.A.P. 9th Cir. 2013); *Gocha v. Downs* (*In re Downs*), 2019 Bankr. LEXIS 456 (Bankr. W.D. Mich. Feb. 15, 2019); *Erickson v. McCaw* (*In re Hodel*), 2024 Bankr. LEXIS 247 (Bankr. C.D. Ill. Feb. 2, 2024); *Allred v. Porter* (*In re Porter*), 2009 Bankr. LEXIS 1119 (Bankr. D.S.D. Mar. 13, 2009); *Satterfield v. Sigmon* (*In re Mahaffey*), 1996 U.S. App. LEXIS 16419 (4th Cir. July 10, 1996).

situation involving intrafamilial executory consideration.[88] Additionally, many courts have expressly declined to make the determination as to intrafamilial executory consideration as a matter of law, instead requiring a trial due to the required inquiry involving questions of fact.[89]

48. Crucially, however, the cases in the following paragraphs demonstrate that courts have also continued to apply the excluded promise clauses to executory consideration in the commercial context between corporate entities. These commercial context cases display two competing views that track the body of pre-enactment case law. Some courts' treatment of the excluded promise clause displays a broader reluctance to recognize wholly unperformed consideration as value, particularly when the promised benefit is speculative or produces no present benefit for the debtor. Other courts contend the excluded promise clause's language is limited, from which they reason that enforceable executory promises outside the specified exclusion may constitute value. Accordingly, while some courts made performance to date a central part of their analysis, all courts consider as critical the promise's enforceability, assignability, likelihood of performance, present economic value, and capacity to confer a direct or indirect benefit on the debtor at the time of the transfer.

49. Initially, many of the decisions denying value involved promises that were not merely unperformed but also indefinite, unenforceable, or unlikely to produce a benefit. For example, *Nisselson v. Empyrean Investment Fund, L.P.* (*In re MarketXT Holdings Corp.*) assessed alleged consideration that included a "vague, speculative promise" of future access to funds,

---

[88] *See, e.g.*, *In re Blair*, 2000 WL 33710889 (Bankr. D.S.C. June 27, 2000); *Frank v. Kiesel* (*In re Denison*), 292 B.R. 150 (E.D. Mich. 2003); *Kendall v. Carbaat* (*In re Carbaat*), 357 B.R. 553 (Bankr. N.D. Cal. 2006); *Nathan v. Libra* (*In re Libra*), 584 B.R. 550 (Bankr. E.D. Mich. 2018).

[89] *Arnold v. Walsh* (*In re Walsh*), 2006 Bankr. LEXIS 5026 (Bankr. W.D.N.Y. Dec. 4, 2006); *Dymarkowski v. McConegly* (*In re Martin*), 2021 Bankr. LEXIS 51 (Bankr. N.D. Ohio Jan. 12, 2021); *Pergament v. Reisner* (*In re Reisner*), 357 B.R. 206 (Bankr. E.D.N.Y. 2006); *Sweet v. Chambers* (*In re Chambers*), 2015 U.S. Dist. LEXIS 133165 (E.D. Mich. Sep. 30, 2015).

together with the opportunity supposedly preserved by that promise. 376 B.R. 390, 414–15, 421–22 (Bankr. S.D.N.Y. 2007). There, the court held that the promise and associated opportunity "provided no value" because the defendants committed none of their own funds, never performed, and gave the debtor no legitimate and reasonable expectation of a benefit. *Id.*[90] Similarly, although not in the context of an avoidance claim but similar to the facts presented here, a bankruptcy court accorded no weight to a conditional future-funding proposal—ironically enough, called a 'support' agreement—because it created no enforceable obligation, remained wholly unperformed, and offered no realistic prospect of payment. *In re Nat'l Gypsum Co.*, 257 B.R. 184, 202–03 (Bankr. N.D. Tex. 2000). Crucially however, in *National Gypsum Co.*, there was no evidence that the purported agreement was executed or even existed; rather, the agreement was simply being offered as evidence to represent what the parties were willing to do but did not represent a finalized contract between the parties. *Id.*

50. In excluding promise clause cases involving assumptions, guarantees, or promised support, courts likewise focused on whether the consideration actually relieved the debtor of an obligation or otherwise benefited the estate. In *Viscount Air Services, Inc. v. Cole* (*In re Viscount Air Services, Inc.*), the court found that an executory guarantee and an assurance that the transferee would relieve the debtor of contractual liabilities conferred no value because the guarantee was never honored, the relevant creditor never released the debtor, and the debtor remained liable. 232 B.R. 416, 434–37 (Bankr. D. Ariz. 1998) (concluding that only actual satisfaction of the debtor's contingent liability might have supplied reasonably equivalent value). Likewise, the court in

[90] *See also Mishkin v. Ensminger* (*In re Adler, Coleman Clearing Corp.*), 247 B.R. 51, 105–10, 113–14 (Bankr. S.D.N.Y. 1999) (using the more categorical language that an alleged enforceable but unperformed promise to deliver securities could not, "by definition," constitute value, although the court alternatively found that the promise was worth no more than the nearly worthless securities to be delivered).

*Nathan v. Brownstone Plastics, LLC*, treated a transferee's assumption of liabilities as valueless where none of the liabilities were paid, contemporaneously or thereafter, and the asserted preservation of the business and its employees did not furnish a cognizable benefit to the transferor. 511 B.R. 863, 868–70 (E.D. Mich. 2014).[91]

51. By contrast, the courts in *Krommenhoek v. Natural Resources Recovery* (*In re Treasure Valley Opportunities*) and *White v. Coyne, Schultz, Becker & Bauer, S.C.* (*In re Pawlak*) treated enforceable contractual rights as presently valuable for the purposes of the excluded promise clause even though substantial performance remained due.[92] The *Treasure Valley* court drew a "strong negative implication" from the excluded promise clause's language that the statute excludes only a specified type of unperformed support promise, and specifically found that an enforceable executory promise outside that exclusion may constitute property or value in a fraudulent transfer analysis. 166 B.R. 701, 703–706 (Bankr. D. Idaho 1994) (discussing how each progress payment of the defendant discharged an installment obligation of the debtor, preserved the debtor's proportionate interest in a binding and assignable contract, reduced the unpaid contract price, and further supported equivalence of value due to the contractor's partial performance and the objective value of the contemplated completed performance).

---

[91] *See also Bailey v. Metzger, Shadyac & Schwarz* (*In re Butcher*), 72 B.R. 447, 450 (Bankr. E.D. Tenn. 1987) (applying the excluded promise clause to prepaid future legal services that were ultimately furnished for the debtor's wife rather than the debtor, concluding that the debtor's estate received nothing from that portion of the arrangement notwithstanding the asserted familial duty of support).

[92] *See Krommenhoek v. Natural Resources Recovery, Inc.* (*In re Treasure Valley Opportunities, Inc.*), 166 B.R. 701, 706 (Bankr. D. Idaho 1994) ("[T]he value of the completed contract was equal to the price, the contract retained its validity as a result of the payments."); *White v. Coyne, Schultz, Becker & Bauer, S.C.* (*In re Pawlak*), 483 B.R. 169, 185 (Bankr. W.D. Wis. 2012) ("As indicated previously, the reasonableness of the value must be determined by the facts and circumstances of the particular case. The notion that the prepayment of future legal services can *never* constitute reasonable value, however, must be rejected for the same reason discussed in *Chomakos* and *Leonard*.").

52. The *Pawlak* court similarly held that prepayment for future legal representation purchased enforceable contract rights, including a breach-of-contract remedy, and therefore conferred a present economic benefit. 483 B.R. 169, 183–87 (Bankr. W.D. Wis. 2012) (acknowledging that the representation depended on future litigation but finding that litigation was sufficiently likely and its expected cost sufficiently estimable to give the contractual commitment value as of the transfer date). The Court further emphasized that the firm's later performance did not establish value by itself, but rather value was established through an evaluation of the likelihood of future payment at the time that the contract was executed. *Id.*[93]

53. The cases taken together demonstrate that no uniform rule exists that all executory consideration either is or is not, solely by virtue of its executorial form, value for purposes of excluded promise clause analysis. Importantly, the decisions in which courts denied finding value generally involved more than the mere postponement of performance but instead involved promises that were unperformed, speculative, unenforceable, unsupported by present rights, ineffective as to their attestations, or directed toward someone other than the debtor. Lastly and most importantly, of the cases that did apply the excluded promise clause to executory

[93] *See also Havis v. AIG SunAmerica Life Assurance Co.* (*In re Bossart*), 2007 Bankr. LEXIS 4349, at *52–56 (Bankr. S.D. Tex. Dec. 21, 2007) (finding, where the debtor received an annuity with an ascertainable current value, an unrestricted withdrawal right, and a contractually guaranteed future income stream, that those present rights made the annuity an investment with current economic value, rather than merely an unperformed promise to make future payments); *In re Morton Shoe Cos.*, 24 B.R. 1003, 1010–11, 1011 n.7 (Bankr. D. Mass. 1982) (recognizing a contingent royalty agreement as having value even though the amount of future payments depended on sales and could not be guaranteed, on the grounds that the agreement resulted from arm's-length negotiations, the record showed a reasonable likelihood that royalties would be earned, and the debtor's own expert evidence assigned the agreement a substantial present value).

consideration, only a few outlier courts did so on summary judgement and without a trial.[94] Most other cases applied the clause after a trial and based on significant evidence.[95]

## B. Arguments and Analysis

### 1. The Plaintiffs Properly Seek Summary Judgment

54. The Plaintiffs argue that the issues on which the Motion seeks partial summary judgment are appropriate for adjudication now as a matter of law. First, the Plaintiffs contend that whether the excluded promise clauses encompass the Funding Agreement—based solely on the language of the excluded promise clauses and the Defendants' own characterizations of the Funding Agreement—presents a discrete legal question that is sufficiently developed to warrant consideration on summary judgment. The Plaintiffs further argue that resolving the issues presented by the Motion would promote the efficient and just administration of these proceedings because (1) determinations in the Plaintiffs' favor "will narrow the issues as to Plaintiffs' constructive fraudulent transfer claims;" (2) the Debtor's bankruptcy case and the adversary proceedings have already been delayed for years; and (3) increasing numbers of Plaintiffs are becoming ill and dying. Motion at 1.

55. The Defendants vigorously contest the propriety of summary judgment on the issues raised by the Motion, asserting that genuine disputes of material fact preclude judgment on most, if not all, of those issues. Although the Court ultimately concludes that summary judgment is unavailable, it rejects many of the Defendants' asserted reasons for that conclusion. First, there is at least a colorable argument that the plain text of the excluded promise clauses encompasses the Funding Agreement based solely on undisputed facts—and, in some instances, the Defendants'

---

[94] *See, e.g.*, *Nathan*, 511 B.R. at 868–89; *In re Butcher*, 72 B.R. at 450, *Crampton v. Immediato* (*In re Persinger*), 545 B.R. 896, 904 (Bankr. E.D.N.C. 2016); *Vaughan v. McDowell* (*In re McDowell*), 173 B.R. 131, 135 (Bankr. N.D. Ohio 1994).

[95] *See supra* notes 87 & 89.

own characterizations—concerning that Agreement. Whether the excluded promise clauses encompass the Funding Agreement is therefore, at most, a mixed question of law and fact.[96] Second, the question might be suitable for resolution on summary judgment as some courts have resolved the applicability of excluded promise clauses at the summary judgment stage.[97] The Court recognizes the value of the parties' efforts to narrow the issues, conserve judicial resources, and seek prompt resolution of a potentially dispositive legal question, particularly in light of the lengthy delay in DBMP's case overall and this fraudulent transfer adversary proceeding. Those considerations do not, however, permit the Court to grant summary judgment unless the governing standard is satisfied.

56. If the Funding Agreement is encompassed by, and therefore excluded under, the excluded promise clauses, the Defendants could not establish reasonably equivalent value for the transfer in the Restructuring. The record establishes that the Debtor's liabilities substantially exceed the value of its remaining assets, and the Funding Agreement is the only asserted asset that could potentially bridge that gap. *See DBMP*, 2021 Bankr. LEXIS 2194, at *67 (stating that, "[a]part from the Funding Agreement, DBMP lacks the ability to pay asbestos claims"). Although reasonably equivalent value ordinarily presents a fact-intensive inquiry, the issue may be resolved as a matter of law.[98] The inquiry commonly requires evidence concerning equivalence, reasonableness, prevailing economic conditions, and market value—all matters that are often variable and fact dependent. But where, as here, the undisputed facts establish that the remaining

---

[96] *See Williams v. Taylor*, 529 U.S. 362, 408 (2000) ("Just as it is sometimes difficult to distinguish a mixed question of law and fact from a question of fact, it will often be difficult to identify separately those state-court decisions that involve an unreasonable application of a legal principle (or an unreasonable failure to apply a legal principle) to a new context.").

[97] *See supra* notes 86 & 94.

[98] *See Ingalls v. Erlewine* (*In re Erlewine*), 349 F.3d 205, 209 (5th Cir. 2003) ("Certain transactions, however, can give the debtor reasonably equivalent value as a matter of law.").

assets have no possibility of equaling the Debtor's liabilities, no further factual inquiry or estimation is necessary to determine that reasonably equivalent value is absent if the Funding Agreement is excluded from the Court's analysis.

57. The Defendants' asserted factual disputes do not alter that conclusion. The actual value of the Funding Agreement, the specific value attributed to the account receivable, any uncertainty concerning the value of M&P, and the ultimate amount of the liabilities as determined through the Estimation Trial are not material to the operation of the precise question presented by the Motion. The Funding Agreement may possess actual economic value yet nevertheless be excluded from the reasonably equivalent value analysis if it falls within the excluded promise clauses. Likewise, the account receivable cannot provide an independent source of value because its existence and value depend on the Funding Agreement. Any uncertainty concerning the value of M&P is immaterial because the Defendants do not contend, and the record would not support a finding, that M&P's value alone is sufficient to eliminate the shortfall between the transferred assets and liabilities. Nor does the Estimation Trial create a material factual dispute concerning the liabilities: whatever the precise amount, the undisputed record establishes that liabilities greatly exceed the value of DBMP's assets without the Funding Agreement.

**2. The Funding Agreement Could Be Excluded from Value as a Matter of Law**

a. The Excluded Promise Clause Applies Regardless of the Defining Clauses

58. The Defendants reject the possibility that the excluded promise clauses could ever encompass the Funding Agreement, regardless of what the excluded promise clauses encompass, since, on their view, the Funding Agreement affirmatively comprises value. Most prominently, the Defendants argue that because the Funding Agreement "clearly" satisfies the Property Phrase, it

"thus cannot fall within the … [Excluding Phrase] as a matter of law."[99] The Defendants base this conclusion on the following facts. First, the Bankruptcy Code "broadly construe[s]" value for purposes of fraudulent transfers to encompass any "'opportunity' to receive an economic benefit in the future," regardless of the directness, conditionality, or present performance to date of such benefits.[100] Second, the Funding Agreement "is a legally enforceable contract right, akin to a guaranty," which, on their view, is one of "a variety of categories of unperformed promises [that courts hold] unequivocally constitute property with value."[101] Lastly, the Funding Agreement has actual "ascertainable expected value," at least as a matter of law, given this Court's statement in *Bestwall* that that Funding Agreement "'is enforceable'" and "'cannot be disregarded'," as well as "the asserted asbestos liabilities, creditworthiness of New CertainTeed, the terms of the [Funding] Agreement, and the probability of performance," which is further "support[ed]" by the "[o]ngoing performance under the Funding Agreement since it was first entered into."[102]

59. This argument fails because, it rests on the flawed view that, if something is already encompassed by the defining clause as value, the excluded promise clauses cannot or do not encompass it, at least as a matter of law.[103] That view misconstrues the structure and text of the value statutes. The fact that the excluded promise clauses follow the defining clause, together with the connector linking the former to the latter—namely, "but does not include" language—signals

---

[99] Objection ¶ 56.

[100] Objection ¶¶ 51–53, 57.

[101] Objection ¶¶ 54–56.

[102] Objection ¶ 56. The Defendants further argue that the "[o]ngoing performance under the Funding Agreement" to date "estops the parties from now contending" it does not constitute value. Objection ¶ 56, 56 n.75 (citing *IHFC Props., LLC v. Whalen Furniture Mfg., Inc.*, 614 F. App'x 623, 626 (4th Cir. 2015) (estopping the defendant from asserting a defense based on statute of frauds when that argument was inconsistent with its use and enjoyment of the benefits of the contract at issue)).

[103] Objection ¶ 19.

that the excluded promise clauses modify and limit the defining clause and not the other way around. Countless statutory interpretation cases confirm this plain meaning and dispel the Defendants' interpretation.[104] Consideration, if encompassed by the excluded promise clauses, is precluded from constituting value for purposes of a fraudulent transfer regardless of whether any consideration falls within the defining clause.

b. The Excluded Promise Clauses Are Not Limited to Familial Support

60. The Defendants argue that the excluded promise clauses extend only to familial support on roughly three grounds: (1) the plain and ordinary meaning of the text; (2) the intra- and inter-statutory context; and (3) the legislative histories and the broader legal context. Beginning with the first, the Defendants assert that "the common meaning of 'support' is in the context of family relationships," citing in support, two familial illustrations from the Merriam-Webster Online Dictionary's definitions of 'support' as a verb and as a noun.[105] However, as the Plaintiffs note,[106] the Defendants' own dictionary reveals no such 'common meaning,'[107] given that, of the more than ten definitions provided therein, no definition is limited to the familial context (or even intimates such a limitation), whereas, of the twenty illustrations also provided by that dictionary,

[104] *See, e.g., Burgess v. United States*, 553 U.S. 124, 136 n.3 (2008) ("'[T]he word "includes" is usually a term of enlargement, and not of limitation'. 2A Singer § 47:7, p. 305 (some internal quotation marks omitted). Thus '[a] term whose statutory definition declares what it "includes" is more susceptible to extension of meaning . . . than where'—as in §802(44)—'the definition declares what a term "means."' *Ibid*. *See also Groman v. Commissioner*, 302 U. S. 82, 86 (1937) ('[W]hen an exclusive definition is intended the word "means" is employed, . . . whereas here the word used is "includes."')).

[105] Objection ¶ 62 (providing as one definition of 'support' in verb form as "to pay the expenses of: maintain, support a family;" providing as one definition of 'support' in noun form as "someone or something that supports: such as a means of livelihood, sustenance, or existence, financial/emotional support, spousal support" (citing *Support*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/support (last visited June 15, 2026)).

[106] Reply ¶ 29.

[107] Objection ¶ 62.

only two illustrations represent a familial context—namely, the two cited by the Defendants.[108] Further, the other definitions and illustrations clearly demonstrate that nonfamilial forms of support, including expressly commercial support, are embraced by the word's common meaning.[109] Accordingly, the plain meaning of the word 'support' does not carry a common understanding of some limitation to familial situations. Rather, 'support' is a generic and broad term, with a plain meaning that generally encompasses the providing of resources, or really anything of use, regardless of the specific context. The Defendants cherry-pick one example of a concept and treat a dimension of that example as imposing a criterion on the interpretation of the meaning of 'support.' The Court is not persuaded by such an argument.

61. Second, as a purported limitation on the excluded promise clause, the Defendants raise how the excluded promise clause appends "or a relative" after "debtor" to identify another potential recipient of the support barred from constituting value.[110] On their view, because the word 'relative' is defined elsewhere in the Bankruptcy Code as limited to familial related individuals, 'support' in the excluded promise clause "can only be understood to refer to familial support."[111] While that view—essentially the *ejusdem generis* canon—is not wholly unpersuasive, especially under a more relaxed approach to statutory interpretation more willing to seek a statute's intended meaning, it ultimately fails under the modern rules of statutory interpretation adhering to stricter textualism.[112] Generally, federal statutory interpretation has moved away and repudiated

---

[108] *Support*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/support (last visited Sept. 3, 2026).

[109] *Id.*

[110] Objection ¶ 63.

[111] Objection ¶ 63 (citing 11 U.S.C. § 101(45) (defining 'relative' as an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree")).

[112] *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law.").

attempts to impart the specialized meaning from one item in a statutory disjunctive list to another item when that specialized meaning applies only to the former and the latter's plain meaning does not independently carry the meaning. *See, e.g.*, *Shular v. United States*, 589 U.S. 154, 164 (2020) (rejecting an argument that "refer[ence] to fully defined crimes" in 18 U.S. Code § 924(e)(2)(A)(i) meant that reference also applied to crimes in § 924(e)(2)(A)(ii) because "'the divergent text of the two provisions . . . makes any divergence in their application unremarkable'" and "Congress' decision" to use language imbued with a certain meaning in one provision "does not speak to whether it" also imbued the next provision with that meaning).[113] The Fourth Circuit and courts in Delaware, North Carolina, Pennsylvania, and Texas have all rejected such attempts to adopt that particular tool of statutory interpretation.[114]

62. Additionally, at the Hearing, the Defendants raised the related argument that because the Bankruptcy Code uses 'support' elsewhere with modifiers to explicitly refer to familial support, the word itself carries that meaning absent the modifiers.[115] But, of course, it is exclusively

---

[113] *See also Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 86–87 (2018) (rejecting the view that 29 U.S.C. § 213(b)(10)(A)'s use of the phrase "servicing automobiles, trucks, or farm implements" modifying "salesman, partsman, or mechanic" meant a specialized understanding of the phrase for "mechanic" carried over for the phrase for "salesman"); *id.* ("'[O]r' is 'almost always disjunctive'" (citing *United States* v. *Woods,* 571 U.S. 31, 45 (2013))); *Osmon v. United States*, 66 F.4th 144 (4th Cir. 2023); *United States v. Redd*, 85 F.4th 153 (4th Cir. 2023).

[114] *See, e.g.*, *Osmon v. United States*, 66 F.4th 144 (4th Cir. 2023); *United States v. Redd*, 85 F.4th 153 (4th Cir. 2023); *Cornette v. State*, 361 A.3d 19, 28 (Del. 2026) (en banc) (stating that "the use of 'or' typically indicates the intent to create alternatives"); *In re The McClatchy Co.*, 386 N.C. 77, 900 S.E.2d 765 (2024); *Claim of Duckett*, 271 N.C. 430, 437 (1967) ("The disjunctive participle 'or' is used to indicate a clear alternative. The second alternative is not a part of the first, and its provisions cannot be read into the first."); *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 184–85 (Tex. 2012) (rejecting that a requirement that certain claims be "'directly related to health care,'" which expressly applied to some terms in a disjunctive statutory series, "should be applied to modify each term in the" series, since that "construction is nonsensical, as it would be entirely redundant as to health care and medical care, unsupported by the text in the attempted application to safety, and render safety largely repetitive of health care"); *see also id.* at 189 ("[T]he specific incorporation of the patient relationship for health care and medical care claims governs the HCLC for departures from accepted standards of medical care and health care . . . . However, that limitation does not apply to claims of safety, which is not defined with reference to a patient." (citation omitted)).

[115] *See generally* Hr'g Tr. 109:05–116:23 (citing 11 U.S.C. § 101(14)(A); 507(a)(1)(A); 522(d)(10)(D)–(E); 522(d)(11)(B), (C), (E); 1328)).

the presence of those modifiers that provides that meaning, and those modifiers are absent from the excluded promise clause. If anything, the presence of those modifiers elsewhere confirms the opposite view—namely, that the word 'support', without a modifier, has a broader, generic meaning and must be accompanied by such a modifier to be limited to the familial context. *See, e.g., City and County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. We have invoked this canon time and time again" (citing *Russello v. United States*, 464 U.S. 16, 23 (1983); *Gallardo v. Marstiller*, 596 U.S. 420, 429–430 (2022); *Salinas v. Railroad Retirement Bd.*, 592 U.S. 188, 196 (2021); *Azar v. Allina Health Services*, 587 U.S. 566, 576–577 (2019))); *see also id.* at 344 (rejecting that view 33 U.S.C. § 1311's reference to 'effluent limitations' in various of its provisions meant the word 'limitations' in 33 U.S.C. § 1311(b)(1)(C), despite not being modified by 'effluent', nonetheless referred to 'effluent limitations', since courts should not "believe that Congress omitted the term 'effluent' from §1311(b)(1)(C) simply because it wanted to save ink or assumed that regulators and interested parties would understand that the omission of the term was inconsequential").

63. Second, as the Plaintiffs note, the excluded promise clause "*also* refers to unperformed promises of support made 'to the debtor,'" which the Bankruptcy Code elsewhere defines as encompassing both natural persons and legal entities.[116] Accordingly, the term "debtor" expressly extends beyond the familial context and cannot be artificially narrowed. *See Burgess v. United States*, 553 U.S. 124, 130 (2008) ("'Statutory definitions control the meaning of statutory

[116] Response ¶ 30 (emphasis in original) (citing 11 U.S.C. § 101(13) ("The term 'debtor' means person or municipality concerning which a case under this title has been commenced."), 41 ("The term 'person' includes individual, partnership, and corporation . . .")).

words . . . in the usual case'" (quoting *Lawson v. Suwannee Fruit & S. S. Co.*, 336 U. S. 198, 201 (1949); citing *Stenberg v. Carhart*, 530 U. S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition."); 2A N. SINGER & J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 47:7, p. 289–99, nn.2–3 (7th ed. 2007))).

64. Finally, the Defendants invoke the legislative histories of the excluded promise clauses, as well as the overall legal context provided by case law and by the various acts enacting the value statutes. As to legislative history, the Defendants cite, first, with respect to the federal value statute, the 1973 Commission Report, which described its value statute proposal as intended to ensure that value generally corresponds with a positive effect on the debtor's balance sheet.[117] Second, with respect to the state value statute, the Defendants cite UFTA's official comment on its proposed state value statute, which first repeats the balance-sheet analogy, but specifically with respect to the benefit conferred upon unsecured creditors.[118] The UFTA comment then explains that its version of the value statute is not intended to exclude all executory obligations, listing negotiable notes, insurance, and services contracts as examples of such obligations that nevertheless "clearly appears to be for value."[119] While those examples, the UFTA comment continues, are not covered by its excluded promise clause, it provides familial support as a contrasting example that is covered.[120]

65. Neither of these sources entirely supports the Defendants' position. Instead, as explained above, the legislative history paints a nuanced picture of prior interpretations of the

---

[117] *See* Objection ¶¶ 64–66 (citation omitted).

[118] *See* Objection ¶¶ 64–66 (citation omitted).

[119] *Id.*

[120] *Id.*

value statutes.[121] Furthermore, as the Plaintiffs note, legislative history may be competently considered by courts conducting statutory interpretation only when a provision's text is ambiguous independently of that legislative history; put differently, the legislative history cannot create the ambiguity. While the Court concurs that the excluded promise clauses can be construed as somewhat broad without context, the plain meaning of 'support' is not itself the source of any ambiguity.

66. As to the balance-sheet goals for the excluded promise clauses in both the 1973 Commission Report and the UFTA comment, nothing about those statements supports a specialized meaning limited to familial support. The interests being promoted there do not differ in any relevant regard between individual and corporate debtors or bear more directly on the familial context than on the commercial context, so as to be limited to the former as a matter of law. Such concerns can and do exist in any bankruptcy case, whether involving consumer or corporate debtors.

67. The additional statement in the UFTA comment that its proposed state excluded promise clause is expressly not intended to cover all executory obligations, along with its explicit mention of three commercial examples of such obligations not covered and a familial support example of an obligation that is covered, fails to support the Defendants' overall point. While the Court wholly concurs with the UFTA comment's reasoning regarding the excluded promise clause's failure to cover all executory obligations, that conclusion does not bar all commercial contracts. Rather, it establishes, at most, that some commercial contracts are not encompassed by the excluded promise clause (as is also true of some personal contracts, as explained below, a

[121] *See supra* notes 69–72.

possibility the Defendants' reading would foreclose), whereas other commercial contracts may be encompassed by the excluded promise clause.

68. As to the contrasting examples, the Court concurs that uncertain intrafamilial support is the quintessential model of the future obligation targeted by the excluded promise clauses in accordance with the balance-sheet goal described above. But the breadth of the balance-sheet goal's intended reach itself precludes the conclusion that the target is narrowly limited to the one intrafamilial illustrative example provided—not to mention that examples, on their face, are just that; they do not define constitutively.[122]

69. Second, the Defendants point to the context of case law both postdating and predating the value statutes. As to the cases decided after passage of the value statutes, the Defendants cite the fact that many cases applying the excluded promise clauses do so in the familial context. First, considered on its own terms, that argument fails because a trend does not constitute a rule. That something is true of many, or even most, instances of a type, does not make it invariably true of that type. Second, considered in the context of the broader case law, the argument is also wholly negated by the many cases that do in fact apply the excluded promise clauses outside the familial context.[123]

---

[122] Additionally, even if UFTA had explicitly espoused the Defendants' exact position as to the excluded promise clauses' meaning, it would still not avail the Defendants because, first, UFTA could only fully inform the state value statutes, all of which include the added ordinary course of business phrase. That phrase functions in the state excluded promise clauses not only as a substantive provision, like any statutory phrase, but also as a mandate for a specific, additional, and somewhat independent analysis under a bankruptcy legal term of art. That analysis also presumes a commercial context. Therefore, the ordinary course of business phrase must override any mild ambiguity that may exist in other parts of the state excluded promise clauses as, by itself, it precludes reliance on legislative history to conclude that the state excluded promise clauses categorically exclude commercial consideration from their scope.

[123] *See infra* ¶¶ 48–53. Not to mention the converse fact that many cases do not apply the excluded promise clauses in the familial context when the same considerations that preclude their application in the commercial context are present. *See supra* note 89.

### 3. The Excluded Promise Clauses Do Not Encompass the Funding Agreement as a Matter of Law

70. According to the Plaintiffs, if the Court holds (as it does) that "support" in the excluded promise clauses encompass the conveyance of economic resources (such as payments) by nonliving persons, the analysis is straightforward from there. It is undisputed, first, that the Funding Agreement requires the conveyance of such resources to the Debtor and, second, that such performance was unperformed as of Old CertainTeed's transfers of assets to New CertainTeed. Thus, according to the Plaintiffs, the Funding Agreement squarely constitutes an 'unperformed promise of support' and therefore cannot constitute value for purposes of this adversary proceeding. However, this reasoning oversimplifies the law in a manner that improperly broadens the excluded promise clauses.

71. 'An unperformed promise of support' is not a generic statutory phrase, but rather a legal term of art deriving its meaning from two hundred years of common law that proceeded the modern excluded promise clauses. The legal history of the excluded promise clause, based on the breadth of the common law and cases preceding its enactment, makes clear that when Congress, the ULC, and the state legislatures adopted the phrase "an unperformed promise of support," first drafted by the 1973 Bankruptcy Commission, they incorporated the legal principles from that common law history, inclusive of its dimensions and nuances therein.[124] That history embeds significant substance in the modern excluded promise clauses. The pre-Bankruptcy Code case law

[124] *See supra* notes 67–73; *see also, e.g.*, *Royal Indem. Co. v. McClendon*, 64 N.M. 46, 49 (1958) (affirming that a transfer of all the debtors' assets in exchange for a promise of support from the transaction counterpart "constituted a conveyance upon a glaring inadequacy of consideration"); *Townsend v. McGrain*, 43 N.J. Super. 438, 440–41 (Ch. 1957); *Westminster Say. Bank v. Sauble*, 183 Md. 628, 631–32 (1944) (holding that "when a person conveys property in consideration of an agreement to support him in the future, and by the conveyance renders himself unable to pay his debts," the conveyance was fraudulent," "[n]ot only [because] such a conveyance, until support is actually furnished, have the infirmity of an executory agreement, but it is presumed as a matter of law that the grantor had fraudulent intent, and that the grantee had knowledge of the grantor's indebtedness (citing *Wilmer v. Placide*, 102 A. 541, 543 (Md. 1917); *Ludlow Sav. Bank & Trust Co. v. Knight*, 92 Vt. 171, 172–74 (1917))).

makes clear that while consideration being executory makes that consideration potentially susceptible to exclusion from value for a fraudulent transfer action, the performance or nonperformance of the promise was not the exclusive fulcrum on which the exclusion of a promise turns. Rather, courts have consistently looked to the objective facts surrounding the consideration and the commercial market's overall treatment of the consideration.[125]

72. On the whole, the thrust of the case law both before and after the enactment of the excluded promise clauses is that such obligations, if sufficiently enforceable and likely to be performed, are not automatically excluded from value as a matter of law. The exact level of uncertainty surrounding the realization of the value promised by the obligation controls whether the excluded promise clauses apply. *Compare In re MarketXT Holdings Corp.*, 376 B.R. at 414 ("In this case, the Debtor could not have had a 'legitimate and reasonable' expectation of benefit from a transaction that transferred all of its non-contingent assets to Defendants in return for a vague, speculative promise, never performed, to let the Debtor have the use of some of the funds to trade in securities." (quoting *Mellon Bank, N.A. v. The Official Committee of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 152 (3d Cir. 1996))), *with In re Pawlak*, 483 B.R. at 185 ("While perhaps 'intangible' in nature, the defendant's promise to supply future legal services was not an 'unperformed promise to furnish support to the debtor,' nor was it without any ascertainable economic value at the time of the transfer. Clearly, the promise of representation through the 'conclusion' of any dischargeability proceeding constituted an economic benefit."). If there is a sufficient expectation of realization of the value purported to be forthcoming, the excluded promise clauses cannot apply, at least as a matter of law.

---

[125] *See In re Treasure Valley Opportunities*, 166 B.R. at 703–06; *In re Pawlak*, 483 B.R. at 185. *See also infra* ¶¶ 40–43.

73. First, as to plain meaning, the phrase 'unperformed promise to furnish support' is somewhat broad but has become a legal term of art given its long and rich interpretive history. 11 U.S.C. § 548(d)(2)(A). As discussed above, 'support' is a broad term that can encompass a wide-ranging meaning, but this characteristic does not make it ambiguous.[126] However, unlike 'support,' 'promise' is less broad and carries a more nuanced meaning. While 'promise' may suggest an obligation, it does not do so unequivocally. Congress could have utilized words such as 'obligation' or 'contract' that have different meanings from 'promise,' as evidenced by the litany of courts that distinguish a statute's use of 'contract' from its use of 'promise.' *See, e.g.*, *Schlant v. Smierciak* (*In re Creeley*), 644 B.R. 264, 266 (Bankr. W.D.N.Y. 2022) ("In interpreting section 548(d)(2)(A), courts have distinguished support obligations from 'unperformed promises of support.' . . . The defining difference is whether the payment satisfies an obligation established by judicial directive, by agreement or by custom and practice." (quoting *Nathan v. Libra* (*In re Libra*), 584 B.R. 550, 562–64 (Bankr. E.D. Mich. 2018); *Schaefer v. Williams*, 15 Cal. App. 4th 1243, 1247 (1993) ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."); *ITX Corp. v. Saad*, 2004-Ohio-3600, 2004 WL 1516856, at *2 (Ohio Ct. App. July 8, 2004) (same); *Paymon v. Wayne State University*, No. 358128, 2024 WL 4982522 (Mich. Ct. App. Dec. 4, 2024) (same). At bottom, the word 'promise' connotes a non-trivial potential for unenforceability especially in light of the other words that Congress could have used.

74. One rationale for the narrower view, as espoused by the Defendants and a few academics, is that the language of the excluded promise clause yields "[t]he strong negative

[126] *See Da Silva v. Att'y Gen. United States*, 948 F.3d 629, 636 (3d Cir. 2020) ("[A] term in a statute is not ambiguous merely because it is broad in scope." (quoting *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 310 (3d Cir. 2010), *as amended* (May 7, 2010))).

implication [] that," except for the excluded promise clause itself, "any other kind of enforceable executory promise is value" under the federal value statute. Following this logic, the Property Phrase "is surely wide enough to reach executory promises."[127]Again, while the Court ultimately does agree with the conclusion that an enforceable executory promise may constitute value, coming to that conclusion requires evaluation of the phrase 'unperformed promise to furnish support' as a legal term of art in the context of two hundred years of common law history. Indeed, the Plaintiffs' broad view of the excluded promise clauses dissects the key words 'promise' and 'support' in the excluded promise clauses but fails to comprehensively evaluate the phrase 'unperformed promise to furnish support.'

75. Additionally, the broad view of the excluded promise clauses would produce absurd results. Under that reading, constructive fraudulent transfer actions would be available as to a litany of transactions that are universally accepted not only as providing value in general, but also critical to normal business operations. If that were the case, whole swaths of routine commercial contracts would be unable to reap the benefit of being statutorily defined as possessing "value." Such a result would fly in the face of "the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer v. United States*, 603 U.S. 480, 481 (2024). This Court refuses to adopt an interpretation

[127] EPSTEIN ET AL., *supra* note 85, at 374–75 (citing 2 DAVID G. EPSTEIN, STEVE H. NICKLES & JAMES J. WHITE, BANKRUPTCY (1992), quoted in *In re Young*, 148 B.R. 886, 892 (Bankr. D. Minn. 1992), *aff'd*, 152 B.R. 939 (D. Minn. 1993), *rev'd*, 82 F.3d 1407 (8th Cir. 1996), *cert. granted, judgment vacated sub nom. Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997), and *rev'd on other grounds*, 141 F.3d 854 (8th Cir. 1998) (adding that "[a]ny other reading of section 548(d)(2)(A) does not give credence to the Code's plain meaning"); in *In re Treasure Valley Opportunities*, 166 B.R. at 704–705, in turn quoted in *Castle Trading*, 2017 Bankr. LEXIS 1462 at *16, in turn quoted in Objection ¶ 53; and in *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 574 n.75 (2016)); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.03, n.75 (16th 2026) (stating that, "with only limited exceptions," "such [as an] unperformed contracts for support, which the statute explicitly excludes from the concept of value," "'any . . . kind of enforceable executory promise is value for purposes of section'" (first citing 11 U.S.C. § 548(d)(2)(A); then citing *In re Treasure Valley Opportunities*, 166 B.R. at 704–705 (in turn quoting EPSTEIN ET AL. (1992), *supra*, at 374–75)))).

of the excluded promises clauses in which a "literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42 (1989).

76. In addition to placing routine commercial contracts outside of the scope of "value," adopting the Plaintiffs' reading of the excluded promise clause would undermine the debt satisfaction clause, something this Court will not do. Under Plaintiffs' interpretation, any promise the Definitions Clauses encompass could be excised from the definition of "value," even if that promise is a satisfaction of future debt.[128] This would be an absurd result. The debt satisfaction clause, the Debt Phrase, falls within the Defining Clauses, but it does not fall within the excluded promise clauses. *See In re Young*, 148 B.R. at 892 n.8 (criticizing various decisions for treating agreements to release claims against the debtor as covered by the debt satisfaction clause but not implicating the excluded promise clause despite such agreements being "[p]lainly, [] executory promise[s]"). Thus, the debt satisfaction clause serves as an example of the absurd results that would follow from applying the broad view of the excluded promise clause.

77. In this case, there is sufficient basis to hold that the excluded promise clause does not apply as a matter of law. The Funding Agreement is an executed contract that presumptively gives DBMP rights to enforce New CertainTeed's obligations under the same. Similarly, there is some factual bases to assume that New CertainTeed will performs its obligations, given the facts that (1) New CertainTeed has performed in part by paying $64.5 million in legal fees as of February 18, 2021, and have continued to pay as of the date of this Order, and (2) the dire consequences that would follow if New CertainTeed did not perform. Throughout the pendency of DBMP's case, the

---

[128] *See infra* ¶ 59 (analyzing the structure of the value statutes by emphasizing that the Property Phrase and Debt Phrase precedes the excluded promise clauses)

Defendants have sought a bankruptcy resolution of their asbestos liabilities, which must be paid from New CertainTeed's assets, in part, for that resolution to be achieved.

78. While the Court acknowledges that there may be some situations whereby the excluded promise clauses could apply without reference to disputed facts, that supposition is far from a universally accepted position. Rather, courts have frequently turned to the specific facts involved in order to make their determinations. [129] The Court deems such an approach appropriate here where the application of the excluded promise clauses lean towards a mixed question of law and fact. Accordingly, the facts in this case inform the meaning of the rule in this context and cannot be ignored. Perhaps that is why so few courts have historically applied the excluded promise clause as a matter of law and usually do so only after a trial.[130] Those few courts that identified a pure question of law did not do so simply because the consideration was executory.[131]

79. Still, the Defendants cannot establish that the Funding Agreement is value merely by declaring it to be enforceable (including by stipulation). Moreover, prior statements by this Court or even the Fourth Circuit do not automatically establish enforceability, given the different contexts, settings, and analyses in which those statements were made. And, indeed, there is at least one significant issue concerning the Funding Agreement's enforceability, namely, that it was not negotiated in arm's-length dealing and is not assignable. Still, this characteristic of the Funding Agreement is not enough to render its enforceability sufficiently questionable as a matter of law.

80. The present record nevertheless leaves factual questions that, even if not independently material, may accumulate sufficient weight as to inform the governing legal analysis. For example, even though the Funding Agreement was not negotiated and resulted in a

---

[129] *See supra* notes 87 & 92.

[130] *See supra* notes 86 & 94.

[131] *See supra* note 94.

contract that contains certain restraints, nonlegal considerations—including the Defendants' interest in achieving a resolution under § 524(g) and the potential reputational consequences of failing to honor the Funding Agreement—may render it practically or effectively enforceable.

81. The Funding Agreement's relative novelty may also limit the usefulness of existing authority and make it difficult for the Court to assess enforceability in the abstract instead creating cascading questions of mixed law and fact. Its enforceability may instead depend on facts concerning confirmation, including the terms and likelihood of a confirmable plan. Further development of the record, is therefore warranted before the Court resolves this issue. That caution is especially appropriate where a hasty adverse ruling would effectively establish critical components of Plaintiffs' claims despite the Fourth Circuit's expressed expectation that these proceedings advance toward confirmation.

82. Therefore, summary judgment is not appropriate on this record to determine the issue of whether the Funding Agreement constitutes fair or reasonably equivalent value for the fraudulent transfer adversary proceeding because the interpretation of 'promise of support' in the excluded promise clause is a mixed question of fact and law and warrants further fact-finding.

**WHEREFORE**, the Motion is **DENIED**.

**IT IS SO ORDERED.**

**This Order has been signed electronically.
The Judge's signature and Court's seal
appear at the top of this order.**

**United States Bankruptcy Court**